**CITY OF ORANGEBURG v. SOUTHERN RY. CO.**

No. 454.

District Court, E. D. South Carolina, Orangeburg Division.

April 29, 1944.

Hugo S. Sims, of Orangeburg, S. C., for plaintiff.

Frank G. Tompkins, of Columbia, S. C., and Adam H. Moss, of Orangeburg, S. C., for defendant.

WARING, District Judge.

The City of Orangeburg brought suit against the Southern Railway Company for the purpose of foreclosing the lien of a paving assessment levied by the City against certain land alleged to be owned by the railway company. The case was first brought in the State court and by appropriate proceedings removed to this court. Motion to remand was refused and an appeal taken to the Circuit Court of Appeals for the Fourth Circuit, which affirmed. The nature of the proceedings and the constitutional and statutory authority under which it was brought and the question of jurisdiction are all discussed in my opinion filed June 25, 1942, and in the opinion of the Circuit Court of Appeals decided April 12, 1943. See 45 F.Supp. 734; 134 F.2d 890.

The case having been remanded to this court for trial, at the request of the attorneys, the matter of the Second Defense set up by the railway company was first considered by me. This defense related to whether the statute of limitations applied and it was agreed that that issue should be determined before going to the trouble and expense of a trial on the mer-

its. By opinion and order filed February 7, 1944, I held that the Second Defense was not sustainable and ordered the same stricken from the answer. 55 F.Supp. 167.

On April 11, 1944, the case was called for trial on its merits and was heard by me without a jury. At the beginning of the hearing counsel for defendant called attention to, and with the permission of the court, inserted a statement in the record regarding the Second Defense heretofore interposed and ordered stricken out by the court; and in order to protect the rights of the defendant if an appeal should be had the court ordered that the record show that defendant desired permission to reargue the issues raised by the Second Defense, defendant claiming that it was a valid bar to the action. The court reiterated the decision and announced that it would stand for the reasons set forth in the order hereinabove referred to. Thereupon testimony was taken on behalf of both plaintiff and defendant.

Plaintiff introduced a plat of the City of Orangeburg. This showed the street, namely, South Boulevard, which was improved by this paving and its location relative to the various abutting properties, including that of the railway. It also appeared that this street was one of three arterial thoroughfares passing through the City of Orangeburg. Officers of the City testified as to appropriate proceedings by City Council directing the improvement of the street, the filing of a petition signed by a majority of the abutting owners and the assessments against the respective properties of their proportionate costs of the street improvement. The city ordinance covering the right and method of the city to assess for street improvements was introduced in evidence. Under this ordinance roadway street improvements may be instituted upon a petition filed by a majority of the owners of property abutting the highway to be improved and the cost of the improvement is paid for one-third by the city and one-third each by the owners on either side of the highway. The proportionate amount assessed against each property owner is based upon the linear or running foot frontage, irrespective of the depth, character, contour or condition of the land. The assessment against the tracts of land are made in the names of the owners shown as owning the respective properties according to the public records. The City Engineer surveyed and measured the respective front footages and furnished this data to the City Clerk who entered the same in an assessment book. These records were exhibited in court and a tabulation made from them put in the record showing the assessment against each piece of land and the owner thereof. The issue in this case is as to the assessments for roadway improvements against the Southern Railway Company. It appears according to the assessment book that there was a small assessment for sidewalk improvements, but the city has abandoned that claim and the amount now claimed for roadway improvement as announced in open court is $6,-925.67 said to be due on January 15, 1927, together with interest to be calculated annually from said date of January 15, 1927, at the rate of six per cent per annum.

It was shown that the front footage of the property of the Southern Railway Company on the western side of the highway was 3,063.40 linear feet and the railway company also has a tract on the east side of the highway whose front footage is 31.80 linear feet. This makes a total abutting footage of 3,095.20 feet and it is upon that basis that the above-named amount is assessed against the railway company.

The City Clerk produced the petition for the paving of South Boulevard from Mill Street to the City limits. That is the portion of the street in question in this suit. This petition which was executed by certain owners of the property abutting upon the portion of the street to be improved shows that there were seven such owners and was signed by four of them. The Southern Railway Company was not one of the signers of the petition. The petition was dated April 10, 1925. From this testimony and the city records it appears that the proceedings for the purpose of the improvement of this street were in proper and regular order and the city later proceeded to actually lay the paving and charge proportionate costs against the respective owners.

The defendant by its answer denied that it was indebted to the city under this assessment and bases its defense mainly upon two contentions, namely: (1) that the petition of the property owners was not signed by a majority of the owners as required by law, and (2) that the street improvement did not improve or enhance the value of the real estate and constitutes the taking of property without just com-

pensation; and as an alternative to the Second Defense, that if there was some improvement it was very small and inconsequential and was unreasonable and arbitrary.

The defendant introduced testimony by which it attempted to show that the petition above referred to had not been signed by a majority of the property owners. This evidence consisted of the testimony of J. Leroy Dukes, Esquire, an attorney at law in Orangeburg, and Messrs. Arthur L. Dukes and John H. Dukes. The defendant sought by this testimony to prove that Mrs. Ella R. Chandler had conveyed portions of the property owned by her to the Messrs. Dukes solely for the purpose of getting a majority of signers to this petition. The attorney who drew the deeds testified that he had prepared them at the order of Mrs. Chandler who was a niece of his and that she had informed him of the considerations and descriptions of the lots; that he had drawn the same; she had paid him for recording expenses and that he had had the deeds recorded and kept them in his office. He stated that he did not know whether any consideration passed and that about two years later Mrs. Chandler had communicated with him and told him that the Messrs. Dukes were going to convey the lots back to her and to prepare appropriate deeds and gave him the considerations to express therein. These considerations were different from the ones in the first deeds. He testified that these deeds were drawn, executed and recorded. The Messrs. Dukes testified that they were young men at the time and that they had no real recollection of the matter excepting that their father, a man of some means, had made advances and gifts to his children and there were debts amongst some of them and that the father managed everything and that they vaguely recollected that he had arranged for some transfers of property between their sister, Mrs. Chandler, and themselves, but did not remember the details. They specifically denied that they had any knowledge of or part in making a transfer for the purpose of getting names to a paving petition. It was stated that all the members of City Council at the time of the transaction are now dead, and there was nothing to show that they or any person connected with the city administration had any part in or knowledge of this real estate transaction. In my opinion the testimony was insufficient to sustain the claim of the defendant that a majority of the property owners did not sign the petition.

In connection with this same matter the defendant introduced in evidence a notice signed by one of its attorneys, namely, Frank G. Tompkins, Esquire, and undated. Attached to this was an affidavit that the said notice had been served upon the Mayor and Councilmen of the City of Orangeburg and members of the City Improvement Commission of the City of Orangeburg, which service was on July 20, 1925. This notice was addressed to the Mayor, Councilmen and members of the City Improvement Commission and was as follows:

"State of South Carolina,  
"County of Orangeburg  

"To R. H. Jennings, Mayor, J. M. Sifly and A. C. Watson, Councilmen; F. A. Adden, Chairman, A. H. Moss, W. L. Mosely, J. S. Salley and F. F. Malpass, members of the City Improvement Commission:

"You Will Please Take Notice: That Whereas the Southern Railway Company has information that the City of Orangeburg by and through you is preparing to pave a certain street known as Railroad Avenue from the point where it is now paved, in a southeasterly direction to the city limits and

"Whereas the said pavement will be laid not on a public street but on the right of way of the Southern Railway on which the City of Orangeburg has no authority to lay said pavement and

"Whereas the Southern Railway Company claims the right to the use of its right of way and objects to any encroachment on same by the building of a public highway on said right of way and

"Whereas the Southern Railway Company will not be benefited by the laying of such pavement as aforesaid, to or on its right of way but will be distinctly damaged thereby and

"Whereas they are informed and believe that a majority of the property holders have not signed the petition for the paving of said proposed street,

"Now, Therefore, the Southern Railway Company by and through its attorney, Frank G. Tompkins, protests against the said paving and will decline and refuse to pay any portion of such paving assessment which may be levied against it by reason thereof; and you are further notified not to trespass or encroach upon the

right of way of the Railway Company, which right of way of said Railway Company extends one hundred (100) feet from the center of the main line track on both sides thereof.

> "Southern Railway Company
> "By Frank G. Tompkins
> "Attorney."

It will be noted that by this notice the railway company acknowledged that it had notice that the street was about to be paved. This is the same South Boulevard involved in this case which was then known as Railroad Avenue. It will also be noted that one of the parties notified, namely, A. H. Moss, Esquire, is one of the attorneys for the railway company. The notice further recites that the proposed paving improvement is not to be laid on a public street, but on the right of way of the Southern Railway and that the City has no authority to lay the pavement, and the railway objects to an encroachment on the same. The petition further states that the railway will not be benefited, but that its right of way will be damaged. And lastly it recites that "they" (sic) "are informed and believe that a majority of the property holders have not signed the petition for the paving of said proposed street." The notice then states that it protests against the paving and will decline and refuse to pay any portion of an assessment and notifies the parties not to trespass or encroach upon the right of way of the railway company, which extends 100 feet from the "center" (I presume by this is meant the middle) of the main line track on both sides thereof. In the argument before me great stress was laid upon this notice. Questioned as to what the Southern Railway had done to prevent the alleged trespass or what steps, if any, it had taken to enjoin the officials from proceeding with the paving or entering upon the railway's lands or entering the assessment against it for its proportionate cost, the answer was "none". The same answer was received in response to a question as to whether the railway company had furnished any information to the public officials as to whether a majority of the property holders had signed the petition. There is a bald allegation on information and belief that a majority had not signed the petition, but there is no proof and no information as to the claim that the Dukes' deeds were not legitimate. So far as the court can ascertain at no time between July 20, 1925, and the date of this hearing did the Southern Railway or its officials or attorneys ever discuss with, or attempt to inform, the city officials of Orangeburg that there was any impropriety, defect or fraud in connection with the Dukes' transfers. I am of the opinion that there has been a total failure to prove that the transfers from Mrs. Chandler to the Messrs. Dukes were fraudulent, but hold that the transfers were valid and legal; that the city had the right to rely upon the public records of the County of Orangeburg and believe that these records showed who the true owners of the property were.

On behalf of the city the point was made in argument that the answer had not sufficiently pled this defense of defects in the petition. The defendant claims that it has raised that issue by its general denial in its first defense and also specifically by its fifth defense, in which it alleged in regard to the petition that "if it was ever signed, was not signed by the owners of the majority of property abutting on the street." It seems to me that this allegation was quite vague and would not include the defense of fraudulent signing. When the city proved who were the recorded owners of abutting property and showed that there were seven of them and that four had signed and that there was no denial that the signatures were genuine, it would not seem that the above-quoted allegation would warrant the introduction of testimony alleging that the property owners held under a spurious deed. Nevertheless, I heard the testimony and considered the whole matter. After the case had been fully argued on behalf of the plaintiff and the major argument for the defendant had been made the second attorney arguing on behalf of the defendant moved for leave to amend the pleading so as to amplify it in order to sustain the charges as to the invalidity of the deeds. I did not allow this. First, because in my opinion the charges were not sustained even if the allegations had been sufficient; and second, because this came as an afterthought long after all the testimony was in and the arguments were about to be concluded. In my opinion there was nothing to this contention and even if there were I do not think that such dilatoriness should be rewarded.

The third and fourth defenses set up by the answer allege that the property was not benefited or enhanced in value and

that the assessment amounts to an unconstitutional taking of the property of the defendant. The facts in connection with this phase of the case were gone into fully in the testimony. The description of the property as set forth in the complaint is that it consists of a long narrow tract of land being 3,063.40 feet along the highway which was improved. In addition the railway company had a small tract of land on the eastern side of the highway of 31.80 feet so that the total front footage consisted of 3,095.20. The main tract of land as shown by the description in the complaint was approximately 3,064 feet in length and varied in width, the same being at its narrowest point about 105 feet and at its widest point about 167 feet. The tract is traversed lengthwise by a railroad track, which, most of the way, is supported on a raised embankment, the height of same varying greatly. It appears that this embankment was built many years ago and was constructed in order to give the railroad a practically level right of way. The contour of the land on the strip is generally that of lands bordering thereon, there being a slight slope from east to west, and except for the building of the embankment for grading purposes and the digging of ditches for drainage purposes the land would be substantially the same as other abutting lands as to general characteristics. The railroad right of way is an old one and has been in use for many years. It appears that the railway company originally had a tract of 200 feet in width (see Exhibit "C", Notice of July 20, 1925), but according to the testimony and argument in this case, from time to time encroachment has been made upon the right of way by various parties and this appears not to have been resisted by the railway company or any action taken to remove the encroachments. For that reason the tract of land under discussion is irregular as above set forth and varies materially in its width. The railway company also claims that the highway itself, which was constructed and paved, as a result of which this case arose, is a part of such encroachments upon the lands of the railway company and that the city in improving and constructing this highway contributed to the narrowing of the railway lands to the above-described dimensions. But no effort was made to stop it excepting the notice hereinbefore referred to, and so far as I can ascertain

no appearance was made before City Council and no legal action was ever taken to protect the alleged rights of the company in this land.

The railway company produced several witnesses to testify as to whether this paving improvement was of benefit to the land in question or could be of benefit. Persons familiar with real estate and real estate developments and contracting and engineering testified. These witnesses testified that in their opinion the paving would be of little value to the property of the railway company. They did testify that it would be of some value and there was testimony to the effect that considered from a residential standpoint a few lots could be obtained at one part of the railway property even in its present condition (see testimony of H. C. Wannamaker). They also testified that some of the property could be used for warehouse purposes and that buildings useful in the business of storing and selling coal, oil and other merchandise could be constructed on the property. There was testimony that the width of the tract of land between the railroad track and the highway varied considerably and there would not be much room for buildings of any size, but that small buildings for various uses could be put there (see testimony of S. C. Fair). All of this testimony was based upon the present use of the property for railroad purposes.

The plats in evidence showed how the railroad track ran through the property. The railway company introduced testimony of engineers and showed that the distances between the bottom of the fill or embankment on which the railroad track was situated and the highway varied materially, and the testimony went further to show that by reason of the construction of the embankment and the roadway that this would not be a desirable tract of land for either business or residential purposes. The plats introduced by the railroad company gave many actual dimensions, but failed to give the widths and many other dimensions that would be of value or help. The railway company also failed to furnish a topographical or contour plat, or plats showing cross sections of the land, nor were any photographs introduced so that it was quite difficult to understand the physical lay of the land in this case. Finding that there was such a dearth of evidence as to how the land looked I myself visited and examined it. It is of

course self-evident that a tract of land varying in width from 105 feet to 167 feet has various uses and values. If it were not for the railroad embankment and railroad track and ditch, the tract could be used for residences, or for commercial or business purposes and there would not be the slightest doubt but that a paved highway contiguous to same would be of the greatest possible benefit.

■ There was also a rather deep ditch varying in depth from less than one foot to over five feet running through a large part of the tract parallel to the railroad track which is used for drainage purposes. There was testimony that a large part of the area, railroad and otherwise, drained through that ditch. The ditch is constructed on the railroad property and was apparently voluntarily placed there by the railway company. It is not shown that there was or is any obligation on the railroad to have constructed, or maintain, this ditch, nor is there obligation to furnish drainage to the surrounding country. As a matter of fact, it seems to have been constructed for its own use and I do not feel that it can now say that because it has dug a deep ditch along its property that that renders the property unusable for any other purpose. As a matter of fact, after looking at the land and considering its situation and location I have reached the conclusion that there is room along a large part of the western part of the highway, that is to say: between the railroad track and the highway, for the construction of small buildings for various uses. It may not be that it would be profitable to put this property to such uses, but I am considering the matter from a potential standpoint. As I understand the law relative to assessments and street improvements it is not necessary to prove that the property itself will be improved, but that will be assumed to be true unless the reverse is proven by the owner, namely: that the property is not, and can not, be improved. In this case there is a possibility of the use of some of the land between the railroad track and the highway in its present condition and there is the use of considerably more of the property on the other side of the railroad track. And if the railroad track and embankment were not there the property would be in the same condition relative to the highway as the property on the east side of the highway. There was much testimony as to the cost and expense of removing the embankment so as to render the tract usable for purposes other than the railroad track. This does not appeal to me as being especially enlightening since we are not assessing the property from the standpoint of what the owner wishes to do with it. As I understand the law, every property which may be used for ordinary purposes is assumed to be improved by a roadway abutting on it and it may be assessed for its proportionate share of the cost irrespective of whether the owner is, or ever expects, to make use of this improvement and even where the owner has voluntarily used, changed or arranged his property so that the improvement is of no benefit to him. For instance, if one owning a tract of land should excavate the soil therefrom and use or sell it for purposes elsewhere, and later a highway bordering this tract is improved, can such owner be heard to say that because he has placed his land in condition where the highway is not of any use to him then that he is not to be assessed his fair share of the improvement? In this case the railroad company chose to devote its land to the building of an embankment, the digging of a ditch and the construction of a railroad track. Apparently it did not care particularly for the rest of its land since it allowed its ownership to be whittled down from 200 feet to as little as 105 feet. However that does not prevent the city from holding it to contribute its share to the improvement of a roadway which could and would have greatly benefited it if the property had been used for purposes like those of other abutting owners.

■■ Under the law of South Carolina a proceeding of this kind is a proceeding in rem and it is to enforce a lien against the property itself. If the property abuts the improved roadway and is susceptible of better use by reason of the roadway improvement it is liable for its proportionate share of the assessment irrespective of the actual amount of benefit received. It has been earnestly argued to me that the railway company did not care for a paved highway and that such was of no benefit to it. It has been equally earnestly argued that the whole system of assessments and roadway improvements, particularly paving, is unjust and inequitable in that costs for paving, as in this case, are assessed against abutting property owners who do not want it and do not use it, merely because the public wants to enjoy a useful highway. But while that argument may

178

have some potency before a legislative body considering the passage of such laws or before a municipal corporation about to authorize the paving of streets, it is not sound before a court whose duty is to enforce the law, not to consider the wisdom of it. Many instances might be shown of unfairness in the front foot assessment system of paying for street improvements. We often see properties on streets heavily assessed for paving improvements where the owners would prefer to be let alone and not have through traffic. We often see property facing on two streets using an entrance on one only and yet the property has to pay for both improvements. We see public highways built through residential sections where the landowners would prefer slight or no surfacing rather than expensive paving fit for commercial vehicles. We see, as in this case, paving laid along railroad property which will probably never be used or beneficial to the railroad company because of the use to which the railroad put it; and we also see paving laid through a city leading to and from railroad depots and freight stations, which is of practically no benefit to the abutting owners, but is mainly used for getting to and from the railroad. So that I feel that although in this particular case the paving is of no great value to the railway company, it should bear its proportion of the cost unless it is an exception to the general rule, and that is the sole basis of its defense here.

■ The outstanding federal case applicable to the law of street improvements in this state is the case of Carolina & N. W. R. Co. v. Town of Clover, 46 F.2d 395, decided by the Circuit Court of Appeals for the Fourth Circuit; opinion by Judge John J. Parker. In the instant case the attorneys for the railway company strongly relied upon the above-named case and claim that the principle is exactly the same in each matter, and that in each case we find a narrow railway strip running through a town which attempts to assess an unjust and burdensome cost for improvement of streets against such strip. It will be seen in the Town of Clover case that the railroad company had a narrow right of way running for over a mile (5,370.8 feet), and that the same was only 24 feet in width. The Town of Clover paved streets, one on either side of the railroad right of way, and attempted to charge the

railroad its proportionate share of the improvement of these two streets. We, therefore, have a situation of a narrow strip of land 24 feet in width with a railroad track running along its middle and an improved highway all along one side and part way on the other side. It is really preposterous to imagine that under any circumstances a strip of this character could have any possible use for two streets bounding it on either side and under no circumstances could we picture this whole strip of land between two streets being turned to any use other than that of a railroad strip. The argument in the case at bar is that the same principle applies to the land in the City of Orangeburg. But to my mind the Town of Clover case turns upon the unusual and extreme facts. As I understand the law from the statutes and decided cases in the State of South Carolina, the street improvement is generally assessable against the property irrespective of the respective individual amounts of enhancement or benefit; but there may be a few exceptions where it is impossible to conceive of any benefit whatsoever arising and where to assess a cost against a piece of property would practically amount to denial of equal protection of law and would in effect be taking away the whole value of the property. Such an unusual, outstanding and exceptional case was shown in the Town of Clover litigation, but I do not think the same picture is presented in the City of Orangeburg.

■ In the Town of Clover case it was shown that the town was quite a small place and that the railroad did very little business there. As a matter of fact, it was shown that the cost of paving assessed against the railroad amounted to 82.32 per cent of the annual income of the railroad from Clover and that it actually amounted to 5.58 per cent of the *entire annual income* of the railway. The decision was clearly warranted by reason of the factual situation and the court there recognized that fact and announced the general doctrines applicable to street improvement assessments to which that case is to be deemed an exception. Among other things, the court says (46 F.2d at pages 397, 398):

"It is true that the Legislature of a state may either directly or by delegation to a municipality require that the cost of a public improvement be assessed against prop-

erty benefited thereby. And ordinarily, without authorizing an inquiry as to the extent of the benefit received by particular property, it may direct that the cost of the improvement of a street or highway be assessed against abutting property in accordance with the front foot rule, as in such cases it is manifestly impossible to apportion the cost in exact accord with the benefits received, and this rule as nearly approximates just apportionment as any which could be devised. [Town of] Tonawanda v. Lyon, 181 U.S. 389, 21 S.Ct. 609, 45 L.Ed. 908; French v. Barber Asphalt Paving Co., 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879. *Furthermore, it is no objection to an assessment that the land assessed is used for railroad purposes, and, while so used, is not benefited by the improvement; for the property must be viewed in the light of its general relations and apart from the particular use to which it is being put at the time.* Louisville & N. R. Co. v. Barber Asphalt Paving Co., 197 U.S. 430, 435, 25 S.Ct. 466, 49 L.Ed. 819." (Emphasis added.)

And again (46 F.2d at page 399):

"The paving of the street for a mile through the little town of Clover was of no benefit to plaintiff and did not enhance in any substantial degree the utility or value of its property, *whether regard be had to its present use or to its general relations and possible uses.*" (Emphasis added.)

In Orangeburg the railway company originally had 200 feet. It now admits that at its widest point it has 167 feet and at its narrowest point 105 feet. According to its own testimony, even in its present condition caused by its own change of the contour of the land by ditching and banking, it has some property that can be used for purposes other than its railroad track and the property has, or had, before it was put in its present condition, and would have if it were returned to its original condition, the same value and availability as other surrounding property. I conclude that the doctrine of the Town of Clover case does not apply here and that this is not a case of unusual and exceptional facts which would take it without the ambit of the general law relating to the assessment of abutting property for roadway improvements.

The Supreme Court of South Carolina has passed upon a similar matter in a case wherein the facts were almost exactly as in this case. I refer to the case of Atlanta & C. A. L. R. Co. v. City of Easley, 117 S.C. 494, 109 S.E. 285. In the report of that case the decree of the Circuit Court is included and the facts of the case are fully set forth. To fully appreciate the similarity of the cases the Circuit Court decree should be read. It will be noted in that case (like the one at bar) the railroad company claimed and was in possession of a tract of land 200 feet in width some years before the City of Easley existed. But the City of Easley claimed that it had a right of way for streets over this 200 feet and it went ahead and made use of it. The railroad contended that the city had no right to the use of this strip for a road and further that it should not be assessed for the abutting street improvements in that it received no benefit and its property was not enhanced in value. The Circuit Court sustained the contention of the railroad company and held that the testimony did not justify the assessment. It found as a fact that the strip of land claimed as a right of way was (117 S.C. at page 507, 109 S.E. at page 289) "up to 1917, one wide space of 200 feet with the railroad tracks in the center thereof. But in the year 1917 the city renamed its streets and denominated that portion of the 200 feet on the south side of the railroad track South Main street, and that portion on the north side of said track North Main street. The assessments in question are levied against the right of way on both sides of the track, which does not touch the pavement on either side of the track, while the business houses and private property abut on the paved area." The Circuit Judge decided that the assessment was discriminatory and unfair. But the Supreme Court reversed the lower court and held that the assessment was valid. The court says (117 S.C. at page 514, 109 S.E. at page 290):

"The railroad is entitled to no immunity other than any other owner of property abutting the streets. *It does not make any difference as to what use the property is put;* they are owners and users of the property if it abuts the streets, and there is nothing in the constitutional amendment making the exemption as to them." (Emphasis added.)

The court cites a number of cases and quotes from them, especially the case of Louisville & N. R. Co. v. Barber Asphalt Co., 197 U.S. 430, 25 S.Ct. 466, 49 L.Ed.

819, and quotes pertinent selections therefrom.

The court further says (117 S.C. at page 515, 109 S.E. at page 291):

"The railroad here transports passengers, freight, and commodities; the public travel to get to the station, they haul freight from the station; and it is now well known that good roads and good streets are a great factor in human happiness, as well as a great benefit to the territory in which they are, and unquestionably, if these streets are good, facilities for transportation will be good, and the business of the railroad will be benefited.

"As to whether an assessment upon the basis of feet frontage without giving the railroad company an opportunity to be heard is a taking of property without due process of law, and unconstitutional: This must be answered in the negative under the authority of [Town of] Tonawanda v. Lyon, 181 U.S. 389, 21 S.Ct. 609, 45 L. Ed. 908; Wagner, [Inc.], v. [Leser], 239 U.S. 207, 36 S.Ct. 66, 60 L.Ed. 230; Hancock v. City of Muskogee, 250 U.S. 454, 39 S.Ct. 528, 63 L.Ed. 1081; Branson v. Bush, 251 U.S. 182, 40 S.Ct. 113, 64 L. Ed. 215."

The Easley and Orangeburg cases are almost identical. In each the tract was originally 200 feet and whittled down by encroachments, including those by the municipalities. I am constrained to hold that one governs the other. We are here dealing with and construing the Constitution of the State of South Carolina and a statute and ordinance passed under the authority of same. It would seem that I am bound in this case by the law of South Carolina as declared by its highest court.

I am of the opinion that the case at bar is entirely different as to its facts from the Town of Clover case and is practically the same as the City of Easley case.

On the question of lack of diligence on the part of the railway company, while the facts here are not exactly the same as in the cases hereinafter cited, nevertheless, the Supreme Court of South Carolina has spoken quite decisively and shown that an abutting property owner who stands by and allows the municipality to go forward with its plans for improving the street and actually enter upon and pave a street, will not be favored when he protests against paying his proportionate share.

In the case of Sullivan v. City Council of Charleston, 123 S.C. 91, 116 S.E. 104, it was held that objection to the number of signatures on a petition praying for an election on the question of issuing bonds for street improvements was waived by failure to file written protest or to take proper proceedings in the court. It is true that in the case at bar a protest was filed. However, this protest did not specify objections or give sufficient insight into what the protest was based on; and many years were allowed to elapse without any court action being taken.

A case even more similar was that of Ballentine v. City of Columbia, 129 S.C. 410, 124 S.E. 643. In that case it appeared that petitions were filed for street improvements and the city passed an ordinance; that the work of improving the street was entered upon and completed and certificates for raising funds were negotiated. It further appears that over two years elapsed from the time of the filing of the petitions until suit was brought and over one year after the certificates had been sold to bona fide purchasers. Commenting upon this fact the court says (129 S.C. at page 414, 124 S.E. at page 644):

"The authorities are ample that, under these circumstances, the abutting owner will be estopped from contesting the validity of the assessment, upon a ground which he was informed of, or of which, with reasonable diligence, he would have been."

Citing almost a half page of authorities from various states, including South Carolina.

It was also argued by the defendant that the railway company would be exempt from responsibility for this assessment because of the fact that the statute provides that the assessment should be against the actual owner of the land. In this case the railway company says that it is not the actual owner, but has a lease of only 999 years' duration. I have not treated this defense very seriously because of the fact that when this case was first heard by me on a jurisdictional question *the plaintiff* attempted to take that position and I ruled against it, and the railway company at that time and in its brief on appeal to the Circuit Court of Appeals strenuously argued that its position was substantially the same as that of an owner.

The Circuit Court of Appeals agreed with that position. See opinion by Judge Soper, 134 F.2d 890. I do not think the present contention should be treated seriously or that the railway company in an equity case should be allowed to take the position that it is the owner for the purpose of jurisdiction, but not the owner for the purpose of payment.

Another reason why the foregoing suggestion is of no avail to the defendant is that this is a proceeding in rem. The Supreme Court of South Carolina in the case of Town of Cheraw v. Turnage, 184 S.C. 76, 92, 191 S.E. 831, 839, says:

"Under the decision of our Supreme Court in the case of Farrow v. City Council, 169 S.C. 373, 168 S.E. 852, 87 A.L.R. 981, it is palpable that it is wholly immaterial in the present case whether the present defendants or any of them were the owners of the property at the time the assessment was imposed, or whether they acquired their titles thereafter. The assessment is against the property and not against the person, and follows the property at all times and under all conditions until it is paid. See 25 R.C.L. 175, 183."

Under the ordinance of the City of Orangeburg the assessment bears interest at the rate of six per cent per annum. The city suggests that this should be computed in annual installments and so compounded. I do not agree. I think that this method of computation was intended to apply where the city collected in installments. But the city did not attempt to enforce earlier collections and has waived its right to interest figured at annual rests. Therefore, I shall allow simple interest only.

The railway company had full knowledge of the intention of the city to lay out and improve this street. It filed a bare protest, but did nothing more; and allowed the city to enter upon its land, take a part thereof, improve the street and spend a large amount of the taxpayers' money. It now protests that it has been unfairly treated and that its property was unjustly taken. I can not agree with this position and find that the facts are as hereinabove set forth and that the city had a right to make this assessment and that the railway company has failed to show that it is an illegal assessment; and it has moreover, been guilty of the lack of diligence in protecting any rights that it may at any time have had.

For the foregoing reasons I have reached the conclusion that the City of Orangeburg obtained and has a lien upon the land as described in the complaint for street improvements and that the same was a valid existing lien at the time of the institution of this suit and that it does not constitute an unlawful or unconstitutional taking of the property of the defendant or denying it the protection of the Constitution and laws of the United States.

In accordance with the foregoing views, I shall file Findings of Fact and Conclusions of Law and enter an appropriate order.