**NORTH CAROLINA ELECTRIC MEMBERSHIP CORPORATION, North Carolina Municipal Power Agency Number One, Duke Power Company, and Piedmont Municipal Power Agency, Plaintiffs,**

**v.**

**Murray B. WHITE, Jr., Peggy G. Upchurch, Caldwell A. Barron, J.B. Comer, John D. Douglas, David Vipperman and Joe D. Newton, in Their Capacity as Members of the County Council of York County, South Carolina; the County Council of York County, South Carolina; Western York County Water and Sewer District of York County, South Carolina; the County of York, South Carolina; Gerald H. Kemp, Jr., Julian Dickerson, Joe Johnson, Ron Wilson, Tom Burton, David A. Cyphers and Freddie M. Clinton, in Their Capacity as Members of the Board of Directors of the Western York County Water and Sewer District, Defendants.**

No. 0:86–2911–15.

United States District Court,
D. South Carolina,
Rock Hill Division.

Sept. 21, 1989.

R.W. Dibble, Jr., Jane W. Trinkley, McNair Law Firm, Columbia, S.C., J. Phil Carlton, Susanna K. Gibbons, Poyner & Spruill, Raleigh, N.C., for plaintiffs; W. Edward Poe, Jr., Associate Gen. Counsel, Duke Power Co., Charlotte, N.C., of counsel.

John P. Linton, Jr., Charlton de Saussure, Sinkler, Gibbs & Simons, P.A., Charleston, S.C., Melvin B. McKeown, Jr., Spratt, McKeown & McCrae, York, S.C., for defendants.

## ORDER

HAMILTON, District Judge.

Plaintiffs, various utility companies owning approximately ninety percent of the Catawba Nuclear Power Station (Catawba) in York County (York), South Carolina, challenge the constitutionality of a water and sewer district (Water and Sewer District or District) created by the York County Council (County Council or Council).[1] Plaintiffs challenge the constitutionality of S.C.Code Ann. § 4–9–30(5)(b) [2] and the ordinance that created the District under the following provisions of the United States Constitution: (1) due process clause of fifth and fourteenth amendments; (2) takings clause of fifth amendment as incorporated through the due process and equal protection clauses of the fourteenth amendment; and (3) "one man, one vote" principle arising out of the equal protection clause of the fourteenth amendment. The matter is currently before the court upon cross-motions for summary judgment.

The factual background giving rise to the instant action is simple and undisputed in all material respects. Apparently at some point in 1981, York citizens and community leaders began to voice the need for improved water and sewer service in the unincorporated areas of the county. During that same year, County Council commissioned a study by B.P. Barber & Associates, Inc., consulting engineers, to determine the water and sewer needs of the county. On November 2, 1982, a countywide referendum was held, the results of which favored providing water service to the unincorporated areas of the county.[3]

Although it is disputed whether Council or private citizens initiated certain discussions which occurred between representa-

---

1. Saluda River Electric Cooperative, Inc. (Saluda), also a part-owner of Catawba, is not a plaintiff to this action.

2. All of the remaining statutory citations in this Order are from the S.C.Code Ann. (Law. Co-op 1976).

3. According to J.E. Klugh, who has served as York County Manager since 1977, one reason for the increasing need for improved water and sewer facilities in Western York was precipitated by Duke Power Company's activities, one of the plaintiffs to the current suit. In the early 1970s, according to Klugh, Crescent Land and Timber Corporation, a wholly-owned subsidiary of Duke Power, offered lots for sale along the shores of Lake Wylie, located within the District. According to Klugh, the sale of these previously undeveloped lots contributed to the substantial development, residential construction, commercial growth, and influx of population in Western York, all of which created an additional need for water and sewer services in that area. Affidavit of J.E. Klugh (Klugh affidavit), August 24, 1989, para. 5. This evidence is apparently uncontradicted by plaintiffs, and, in any event, is not material to the court's disposition of this matter.

tives of the City of York and the Town of Clover, two municipalities located in Eastern York, and county officials and residents of Western York, it is clear that such discussions did occur. *See* York County Council Minutes (Council Minutes), April 2, 1984, para. III, September 18, 1985, para. VII, December 2, 1985, para. XI. As a result of these discussions between representatives of the neighboring municipalities and the citizens of the unincorporated areas of York and their elected officials, County Council approved the creation of a committee to study the establishment of a special tax district in Western York on December 16, 1985, and Council members Harold Dickson and Peggy G. Upchurch were appointed to the committee. *See* Council Minutes, December 16, 1985, para. 4. This committee was called the "Western York County Water Study Committee" (Water Study Committee). *Id.* Subsequently, County Council was regularly apprised of the Water Study Committee's progress. Council Minutes, January 20, 1986, para. III, February 3, 1986, para. VI, April 8, 1986, para. IV. Council also authorized B.P. Barber & Associates, Inc. to update its earlier water study and to assist in the development of a special tax district in Western York. *Id.*

The Water Study Committee created by Council met on January 27, 1986, and, as plaintiffs do not dispute, reviewed a proposed draft ordinance prepared by the York attorney for the creation of a special tax district to be known as the Western York County Water and Sewer District. Klugh affidavit, paras. 9, 11.[4] On June 2, 1986, County Council adopted a resolution endorsing and supporting the creation of the District. Klugh affidavit, Exhibit A. At its meeting on June 25, 1986, County Council accepted a petition signed by approximately 3,300 freeholders in Western York requesting that a special referendum and election be held to determine whether Council should be authorized to enact an ordinance to create the proposed district. Council Minutes, June 25, 1986, para. VI. At the August 18, 1986, Council meeting, representatives of Duke Power Company, one of the plaintiffs in this action, appeared before Council to protest the *proposed referendum and election* scheduled for September 23, 1986. Duke Power representatives presented Council with a constitutional burdens and benefits analysis, asserting that the proposed method of financing the water and sewer improvements was totally unfair to Duke Power and its customers. Council Minutes, August 18, 1986, para. II.

On July 7, 1986, County Council ordered that a special referendum and election be held on September 23, 1986, for the purpose of determining whether the freeholders and electors within the area encompassed by the proposed district favored its creation. The voters were requested to give their opinion on the following questions:

1. Shall a special tax district to be known as the Western York County Water and Sewer District and comprised of approximately 183.6 square miles, the area of and boundaries of which are described in the Notice of Election and appear on the tax map of York County filed in the office of the Assessor of York County, be created in order that water and sewer services may be rendered therein and

---

**4.** Plaintiffs contend that the Klugh affidavit does not meet the personal knowledge requirement of Rule 56(e), Fed.R.Civ.Proc., because it allegedly does not provide any foundation for Klugh's ability to testify on the alleged facts stated therein. Although it is clear that plaintiffs' construction of Rule 56(e) is unnecessarily grudging, *see Alphin v. United States,* 809 F.2d 236, 239 (4th Cir.), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1578, 94 L.Ed.2d 768 (1987), *Grayson v. Aetna Insurance Company,* 308 F.Supp. 922, 927 (D.S.C.1970), *Bransted v. Wolke,* 455 F.Supp. 489, 491 (E.D.Wis.1978), the court has nonetheless not relied on any of Klugh's assertions that are not independently supported by uncontradicted evidence of record. Although, as plaintiffs indicate, the factual involvement of Council members in the District's development is not relevant to the question of whether § 4–9–30(5) vests Council with discretion to alter the boundaries of a district proposed by the freeholders or, alternatively, to refuse to enact an ordinance to create such a district, it is nevertheless relevant to the question of whether Council in fact exercised the legislative discretion that is conferred upon it by § 4–9–30 of the Home Rule Act.

an annual millage of zero mills be levied in order to provide for the operation and maintenance of the functions of said special tax district, such operation and maintenance to be financed instead by service charge and/or user fees, in addition to ad valorem taxes levied to pay the debt incurred by the issuance of general obligation bonds for such special tax district?

2. Shall the York County Council be empowered to issue and sell, either as a single issue, or from time to time as several separate issues, general obligation bonds for Western York County and Water and Sewer District not exceeding $22 Million which will be paid from the levy and collection of ad valorem taxes without limit as to rate or amount on all taxable property located solely within that area of York County which is the Western York County Water and Sewer District, whose proceeds shall be applied to defray the cost of constructing a water treatment and distribution system?

The special referendum and election was held as scheduled, and the dual ballot box arrangement prescribed by § 4–9–30(b)(5), a section of a comprehensive South Carolina statute commonly known as the Home Rule Act, was utilized. A majority of both classes of voters entitled to vote, the electors and the freeholders, answered the two questions submitted in the affirmative by margins exceeding sixty percent.

Thereafter, Council duly considered and enacted an ordinance creating the District as approved by both classes of voters. On October 6, 1986, Council gave first reading to the ordinance creating the District. Council Minutes, October 6, 1986, para. XIII. The second reading of the proposed ordinance occurred on October 20, 1986, at which time Council decided to hold a public hearing on the proposed ordinance prior to its meeting scheduled for November 10, 1986. Council Minutes, October 20, 1986, para. X. At the November 10, 1986, public hearing, plaintiffs' counsel appeared and opposed the subject ordinance. Council

subsequently unanimously approved the ordinance and plaintiffs brought the current action seeking the following relief: (1) a declaration that § 4–9–30 is unconstitutional; (2) a declaration that the ordinance creating the District is unconstitutional; and (3) a permanent injunction against creation of the District.

The Water and Sewer District itself, which contains about 183.6 square miles, lies south of Charlotte, North Carolina, and immediately to the west of the I–77 corridor. It includes a substantial portion of the western shoreline of Lake Wylie. Affidavit of Michael B. Burkhold, para. 8. The Lake Wylie shoreline is a principal area of development to be served by the District. *Id.*, paras. 6, 10, 11, and 13. The District's western border follows the North Carolina state border as it cuts through Lake Wylie and continues that line through the lake. The District includes 54.9 miles of the lake's western shoreline. *Id.*, para. 7. The proposed water intake and water treatment facility for the District, which constitute the District's hub, is to be located on the western shore of Lake Wylie near Catawba. *Id.*, para. 11.

Catawba is located on the neck of a peninsula of land on the western shore of Lake Wylie well within District boundaries. Residences to be served by the system are located all around Catawba, which is located 31.7 miles along the shoreline from the most northeastern point of the shore in the District and about 19.2 miles along the shoreline from the most southeastern point of the shoreline not contained in the District. *Id.*, para. 12. The nearest land which is not part of the District is 1.5 miles away to the southeast near Newport. *Id.*

In support of their motion for summary judgment, defendants contend that res judicata requires dismissal of this action due to resolution of a related state court action in their favor. Alternatively, defendants submit that plaintiffs lack standing to attack § 4–9–30(5) on equal protection grounds because plaintiffs are freeholders and because both freeholders and electors voted overwhelmingly for the Water and Sewer District. Defendants also assert that the

ordinance creating the District does not violate plaintiffs' due process rights or the "one man, one vote" principle embodied in the equal protection clause of the fourteenth amendment. Finally, defendants argue that the tax burden imposed upon plaintiffs' property under the ordinance does not violate the takings clause of the fifth amendment as applied to the states through the fourteenth amendment as a matter of law.

Plaintiffs seek summary judgment on three alternative grounds. First, plaintiffs contend that § 4-9-30(5)(b) is unconstitutional as a matter of law because it violates the due process clause of the fifth and fourteenth amendments. Plaintiffs submit that this statutory provision is constitutionally defective because it allegedly permits a special tax district to be created by private citizens without providing for review of the propriety of its boundaries by a legislatively-authorized tribunal having the power to determine whether property included within the district should be so included. Plaintiffs also contend that the dual ballot box voting scheme codified in § 4-9-30(5)(b) creates a property-based classification that violates the equal protection clause of the fourteenth amendment. Specifically, plaintiffs argue that requiring the freeholders to approve the proposed district, in addition to the electors, could potentially dilute the votes of electors and thus violates the "one man, one vote" principle enunciated in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Plaintiffs also submit that the ad valorem tax imposed upon their property by the subject ordinance amounts to a confiscatory taking of their property in violation of the fifth and fourteenth amendments.

Although defendants have moved for summary judgment on all of plaintiffs' causes of action, plaintiffs initially contended that summary judgment was not appropriate on their second cause of action. Plaintiffs' rationale for excluding the takings clause claim from the summary judgment process was two-fold. First, plaintiffs argued, and defendants did not dispute, that the ad valorem valuations of property located within the proposed district were out of date. Second, plaintiffs contended that the county had not determined the precise level of taxation plaintiffs' property would bear under the proposed ad valorem schedule. Accordingly, plaintiffs submitted that an issue of fact existed which precluded judgment as a matter of law on their second claim for relief.

On August 14, 1989, the court held a hearing in this matter, at which time the parties agreed that plaintiffs' property would bear at least the majority, and possibly up to ninety percent, of the tax burden necessary to finance the Water and Sewer District. The court ordered defendants to determine the exact proportion of the cost plaintiffs would bear under the tax[5] and to submit this information to the court and serve it upon plaintiffs by September 5, 1989.[6] Subsequently, on August 15, 1989, the parties were directed to submit additional briefs on the issue of whether summary judgment should be granted on plaintiffs' second cause of action, and were also told to assume, for purposes of their briefs, that the burden imposed on plaintiffs' property would fall between the two parameters stated hereinabove.[7]

---

**5.** According to defendants, the current valuation of residential property located within the District was the cause of the uncertainty. Defendants stated that an outside consulting firm could determine these valuations, however, and further stated that this could be accomplished by September 5, 1989.

**6.** The precise burden Catawba will bear under the ordinance is critical because plaintiffs' second claim for relief alleges that the tax imposed by the subject ordinance upon their property violates the fifth and fourteenth amendments because it results in a flagrant and palpable inequality between the burden imposed compared to the benefit received.

**7.** The parties agreed to this arrangement with the understanding that the court would not consider the respective motions for summary judgment until defendants submitted the requested information. At that time, the court agreed to substitute the precise percentage of the tax plaintiffs would bear under the ordinance in place of the approximation relied upon by the parties.

Pursuant to the court's direction, defendants have determined the current ad valorem valuation for all real property located within the District. According to Isaiah Boyd, York County Auditor, the total assessed value of all taxable real property located within the District for the 1989 tax year is $278,902,472.00. The total assessed value of Catawba is $221,897,870.00, or 79.5611% of the total assessed value of all real property located within the District. The total assessed value of plaintiffs' interest in Catawba, excluding the interest of Saluda,[8] is $198,643,460.00, or 71.2233% of the total District-wide assessment. Each of the individual plaintiffs' respective share of the total assessed value of all property located within the District is as follows: Duke Power Company, $17,390,380.00, or 6.2353%; North Carolina Membership Corporation, $68,336,140.00, or 24.5018%; North Carolina Municipal Power Agency Number One, $83,537,570.00, or 29.9523%; and Piedmont Municipal Power Agency, $29,379,370.00, or 10.5339%. Supplemental Affidavit of Isaiah Boyd, paras. 3–7. Neil J. Keane, Treasurer and Finance Director of plaintiff Piedmont Municipal Power Agency, states that a tax of seven mills, the maximum assessment permissible under the subject ordinance, would result in an annual tax of $1,628,655.76 upon Catawba. The annual tax burden on plaintiffs, excluding Saluda, would equal $1,457,189.02. Declaration of Neil J. Keane, paras. 1, 3.[9]

Because the precise burden which plaintiffs' property will bear under the subject ordinance has now been determined, and because no *material* facts relevant to this claim otherwise remain in dispute, all parties and this court agree that summary judgment is the appropriate vehicle for resolution of all three of plaintiffs' claims for relief. Letter from Jane W. Trinkley to the court (September 6, 1989). Accordingly, the respective motions for summary judgment are now ripe for disposition, which necessitates a discussion of the following issues: (I) whether res judicata bars plaintiffs' suit in its entirety based on the judgment rendered in favor of defendants in the parallel State proceeding; (II) whether § 4–9–30(5)(b) violates plaintiffs' right to due process of law under the fourteenth amendment; (III) whether plaintiffs have standing to assert an equal protection challenge to the referendum and election held September 23, 1986, and the procedures governing such referendum and election contained in § 4–9–30; and (IV) whether defendants' legislative determination to finance the proposed water and sewer improvements through imposition of ad valorem taxes upon the real property located within the District, including plaintiffs' property, constitutes a palpably discriminatory and wholly arbitrary confiscatory taking of plaintiffs' property in violation of the fifth and fourteenth amendments.

## I. Res Judicata:

Defendants contend that res judicata precludes the present action because (1) the related state court action was dismissed in favor of the same defendants, (2) that action involved the same subject matter as the present suit, and (3) plaintiffs could have raised their federal constitutional arguments in that suit. Plaintiffs contend, however, that res judicata does not bar this action because the state court action did not involve the same issues, or, alternatively, because defendants waived their right to assert res judicata by consenting to plaintiffs splitting their cause of action between the state and federal courts.

Under the Full Faith and Credit Clause, Article IV, Section I of the U.S. Constitution, "a federal court must give to a state court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). *See also* 28 U.S.C. § 1738. The preclusive

---

8. See *supra* n. 1.

9. It should be noted that Keane calculated these figures based on the 1987 assessed values provided in the original affidavit of Isaiah Boyd, and not based on the 1989 assessed values contained in the Boyd's supplemental affidavit.

effect of the state court judgment is thus determined by South Carolina law.

Under South Carolina law "[t]he essential elements of res judicata are identity of parties, identity of subject matter and adjudication in a former suit. A litigant is barred from raising any issue which was adjudicated in the former suit and all issues which *could have been raised in the former suit." Ford v. Watson,* 282 S.C. 66, 69, 316 S.E.2d 429, 431 (App.1984) (emphasis added) (citations omitted). The only element of the res judicata formula seriously disputed in the present case is whether both suits involve the same subject matter. Although a strong argument can be made that res judicata might otherwise bar the present action, this court nevertheless finds that defendants consented to plaintiffs splitting their cause of action between federal and state court and thus waived any defense predicated on the doctrine of res judicata.

It is generally recognized that the rule against splitting a cause of action is primarily for the benefit of the defendant, and that he or she may permit plaintiff to split the cause of action. Significantly, if the court determines that defendant has expressly *or implicitly* consented to the splitting of the cause of action, defendant is held to have waived the right to assert res judicata. *Annotation,* 40 A.L.R.3d, 108, 111 (1971). *See* Restatement (second) of Judgments § 26(1)(a) 1982. *Calderon Rosado v. General Electric Circuit Breakers, Inc.,* 805 F.2d 1085 (1st Cir.1986). It is also universally recognized that a defendant asked to defend two lawsuits alleging the same cause of action waives the right to object to the litigation of both actions if he or she does not protest at the earliest possible time. *See Southern Stock Fire Insurance Company v. Raleigh, Charlotte & Southern Railway Company,* 179 N.C. 290, 293, 102 S.E. 504, 505 (1920); *Diversified Mortgage Investors v. Viking General Corporation,* 16 Mass.App. 142, 450 N.E.2d 176 (1983). Under South Carolina law the owner of a single cause of action is prohibited from either dividing or splitting that cause of action in order to make it the subject of several causes of action "unless the party against whom the cause of action exists consents thereto." *Nunnery v. Brantley Construction Company, Inc.,* 289 S.C. 205, 345 S.E.2d 740, 743 (App. 1986).

■ Defendants' argument that res judicata bars the present action suffers from two fatal flaws. First, defendants have waited too long to assert res judicata, and, in addition, they have impliedly, and perhaps explicitly, consented to plaintiffs' decision to split their cause of action between state and federal court. Although plaintiffs filed their state and federal complaints on the same day, defendants did not raise any objection to either suit in their present answer *or* in the state court action. In addition, eight months after both suits had been filed and after judgment had been rendered in the state action, defendants again failed to raise this issue and urged this court to grant plaintiffs' motion to stay.

■ Perhaps most important, the transcript of the hearing held on August 7, 1987, reveals that defendants consented to plaintiffs' motion to stay this action with the understanding that if plaintiffs' suit in State court was ultimately unsuccessful, they could return to this court to litigate their constitutional challenges to creation of the District. *See* Transcript, Civil Action No. 86–2911, August 7, 1987. Indeed, the motion to stay was predicated on the concept that the parties would return to this court for litigation of the federal constitutional claims only if necessary after resolution of the pending state action. Defendants thus waived any objection to plaintiffs' federal suit by consenting to an arrangement whereby plaintiffs could return to this court to litigate their constitutional claims should their state suit ultimately prove unsuccessful. Accordingly, res judicata does not bar the present suit.

## II. Due Process:

Plaintiffs apparently contend that § 4–9–30(5)(b) denies them due process of law because, according to plaintiffs, it per-

mits a particular group of private citizens to determine what property will be included within a special district, and provides no procedure whereby landowners within the proposed district are given an opportunity to have their objections heard by a tribunal which has been legislatively-authorized to consider whether their property will be benefited (*i.e.*, a "benefits" hearing). *Browning v. Hooper*, 269 U.S. 396, 46 S.Ct. 141, 70 L.Ed. 330 (1926). Specifically, plaintiffs note that § 4–9–30(5)(b) provides that a referendum and election "shall be held" whenever fifteen percent of the freeholders in a proposed district sign a petition requesting its creation. Furthermore, the statute directs that the "district shall be created by council ordinance if the referendum and election are passed by a majority of electors and freeholders." Plaintiffs contend that County Council had no discretion in this process to determine which property should be included within the District, and that due process requires that a benefits hearing be held pursuant to stat-

ute before a tribunal which has the authority to alter the boundaries of the proposed district. Plaintiffs assert that no such entity had authority to alter the boundaries of the district proposed by the petitioning freeholders, and thus that this statutory scheme violates their due process rights.[10]

Defendants, on the other hand, argue that § 4–9–30 must be presumed to be constitutional and must be liberally construed to grant powers to county governments. Defendants concede that use of the word "shall" in the statute is not particularly artful, but nevertheless argue that it connotes only that certain acts must occur before a special tax district can be created. In other words, defendants argue that whenever "shall" is used in the statute, it merely connotes a necessary prerequisite to formation of a valid district, and does not eliminate all discretion from the process. Defendants further contend that South Carolina law is particularly adamant that statutes be interpreted in a manner

---

**10.** Interestingly, plaintiffs also contend that the hearing held by Council after the referendum and election came too late in the statutory process to provide meaningful review. To satisfy due process, plaintiffs argue that the benefits hearing must occur *before* the referendum and election in order to ensure that all electors and freeholders within the proposed district have an opportunity to be heard. Plaintiffs' seemingly logical argument must be rejected for several reasons. First, the statutory scheme makes quite clear that Council has no authority to even consider creation of a special tax district, much less hold a hearing on the issue, unless and until the voters approve the proposal, *see* § 4–9–30(5) (county council has authority to levy ad valorem taxes *provided* the special tax district is first approved by voters in proposed district). As a result, the statute does not vest Council with jurisdictional authority to hold a hearing until *after* voter approval of the proposed district by referendum and/or election. Second, and perhaps most important, were the hearing held prior to the referendum and/or election, the results of the hearing might invalidate the freeholder's petition. In other words, assuming (1) that the freeholder's petition contained fifteen percent of the eligible freeholders in a proposed district, (2) that council held a prereferendum hearing at which time it determined that the proposed boundaries must be altered, and (3) that under the revised district boundaries, the freeholder's petition only represented the signatures of less than fifteen percent of the eligible freeholders in the "new" proposed district, then

the freeholders would effectively be thwarted in their desire that a referendum and/or election be held on the proposed district. Obviously, the drafters of the Home Rule Act apparently foresaw this potential incongruity, and opted to afford affected landowners a more meaningful hearing held after the referendum and/or election.

Thus, in the event that county council determines, in the exercise of its legislative discretion, that the boundaries of the proposed district must be altered, it is apparent that the freeholders must start anew. Indeed, this was Council's own understanding of § 4–9–30(5) in the instant action if the boundaries of the proposed district were enlarged after its creation. Klugh affidavit, Exhibit C, Statement of York County Council, September 2, 1986, p. 3. In this manner the proper percentage of freeholders required by § 4–9–30(5)(a), (b), or (c) is assured in the prereferendum and/or election petition, and the referendum and/or election is held for the benefit of the voters in the "new" district. Because a determination by county council to vary the boundaries of a district apparently favored by their constituents would undoubtedly be a decision made only where constitutional or other considerations outweighed the popular will, it is not unreasonable to require the referendum and/or election to be held again. Accordingly, plaintiffs' argument that a hearing held after the referendum and election does not satisfy due process must be rejected.

that preserves their constitutionality.[11] Defendants finally contend that County Council in fact reviewed the proposed district boundaries, and that adoption of plaintiffs' construction of § 4–9–30 would lead to absurd results.

It is uniformly recognized that due process is a flexible concept which requires only "such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). *See Mathews v. Eldridge,* 424 U.S. 319, 332–35, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *United States v. Charters,* 863 F.2d 302, 306–07 (4th Cir.1988); *Harrison v. United States Postal Service,* 840 F.2d 1149, 1153–55 (4th Cir.1988). Contrary to plaintiffs' assertion, however, it is quite evident that plaintiffs were not entitled to notice and an opportunity to be heard, at least not in the sense required by *Browning v. Hooper, supra.*

In *Hancock v. City of Muskogee,* 250 U.S. 454, 39 S.Ct. 528, 63 L.Ed. 1081 (1919), owners of realty sought to enjoin defendants, a municipality and certain of its officials, from encumbering their lands with a special assessment necessary to finance a sewer improvement district. Rejecting plaintiffs' contention that they were entitled to notice and opportunity to be heard at some stage of the local legislative proceedings, the Court concluded that plaintiffs were not entitled to a hearing or an opportunity to be heard because the full legislative power over the issue of local taxation had been conferred by the State legislature upon the municipal defendant and its officials. *Id.* at 459, 39 S.Ct. at 530. Under these circumstances, the Court reasoned, the line of decisions which, like *Browning v. Hooper, supra,* had required notice and opportunity to be heard, were distinguishable. Unlike the delegation of authority by the legislature in those cases, where the question of benefits had been delegated to some "inferior tribunal with *administrative* or *quasi-judicial*" authori-

ty, the legislative determination by a local legislative body was held to constitute the equivalent of state legislative action. *Id.* (emphasis added). Consequently, the Court concluded that local government's determination on the question of benefits was conclusive absent an actual abuse of power. *Id.*

■ Similarly, § 4–9–30, a provision of the comprehensive Home Rule Act, clearly vests county governments such as County Council with certain enumerated *legislative* powers. *See* § 4–9–120 ("council shall take *legislative* action by ordinance") (emphasis added); *North Charleston Land Corporation v. City of North Charleston,* 281 S.C. 470, 474, 316 S.E.2d 137, 139 (1984) ("[a]n ordinance is a *legislative* enactment and is presumed to be constitutional") (emphasis added). Additionally, the South Carolina legislature has vested the respective county governments with full authority over the assessment of local ad valorem taxes under § 4–9–30. Because Council determined the benefits question in the exercise of its legislative discretion, like the municipal defendant in *Hancock,* plaintiffs' contention that § 4–9–30 denies them due process of law because they were allegedly not afforded an opportunity to be heard on the benefits question is without merit.

Alternatively, assuming that *Browning v. Hooper, supra,* controls the disposition of this action, the statutory process codified at § 4–9–30(5), and incorporated into the Home Rule Act, satisfies fourteenth amendment due process if: (1) the statutory process itself requires a hearing before a legislatively-authorized tribunal with authority to reject or alter a palpably discriminatory district; and (2) affected landowners were in fact afforded a benefits hearing in the present case.

Section 4–9–30 (emphasis added) provides in pertinent part:

**§ 4–9–30. Designation of powers under each alternative form of govern-**

---

**11.** State court precedent is helpful, but not controlling, where plaintiff alleges that the statutory process at issue violates rights guaranteed under the United States Constitution. Neverthe-

less, to withstand federal constitutional scrutiny, the statute must independently satisfy federal standards of constitutionality.

**ment except board of commissioners form.**

... each county government within the authority granted by the Constitution and subject to the general law of this State *shall* have the following enumerated powers which *shall* be exercised by the respective governing bodies thereof:

.     .     .     .     .

(5) to assess property and levy ad valorem property taxes and uniform service charges ... and make appropriations for functions and operations of the county, including, but not limited to, appropriations for general public works, including roads, drainage, and other public works; water treatment and distribution; sewage collection and treatment; ... *provided*, however, that prior to the creation of any special tax district for the purposes enumerated herein, one of the following procedures *shall* be required:

.     .     .     .     .

(b) When fifteen percent of the freeholders in a proposed special tax district sign a petition requesting the creation of such a district, a referendum and election *shall* be held. Separate boxes *shall* be maintained to receive the votes of the freeholders voting in the referendum and those of the electors voting in the election. A majority of electors voting and a majority of the freeholders voting in the proposed special tax district *shall* approve the creation of that district, the nature of the services to be rendered and the maximum level of the taxes authorized to be levied....

.     .     .     .     .

... [where] the result is favorable for creation of a special tax district, such

district *shall* be created by council ordinance....

Although § 4–9–30 does not incorporate a hearing provision, that section, as already indicated, is part of the comprehensive Home Rule Act.[12] Section 4–9–30 is incorporated in Chapter 9 of the South Carolina Statutes Annotated, entitled "County Government," and more specifically, is incorporated into Article I of Chapter 9, entitled "General Provisions." The substantive provisions of Article I delegate legislative authority from the State legislature to county governments for various governmental functions of substantial local interest, but do not individually contain hearing provisions. Nevertheless, two provisions intended to satisfy procedural due process protections are incorporated into this Article, which require several public meetings and a public hearing before routine legislative action can be taken by County Council. Specifically, §§ 4–9–120 and 4–9–130 require three noticed public meetings and at least one public hearing before County Council, among other things, can enact an ordinance to levy taxes.[13]

Precisely because *no* substantive provisions are incorporated into either of these procedural sections, it is apparent that these provisions were intended to operate in conjunction with the substantive provisions also contained in the same Article of this comprehensive statute, and thus are triggered by certain actions of County Council under Article I. It is clear, therefore, that § 4–9–30, as part of the comprehensive statutory scheme codified in Chapter 9, Article I of the South Carolina Code, does require a noticed public hearing to afford affected parties an opportunity to be heard—*before* taxes can be levied by ordinance.

---

**12.** This court is required, despite plaintiffs' protestations to the contrary, to consider the procedural protections accorded by the Home Rule Act in its entirety, which are applicable to § 4–9–30 due to its inclusion within this comprehensive statute, and cannot consider § 4–9–30(5) viewed in isolation. *See Dane v. Jackson*, 256 U.S. 589, 600, 41 S.Ct. 566, 568, 65 L.Ed. 1107 (1921).

**13.** Section 4–9–120 provides that county council shall take legislative action by ordinance, and that all ordinances except emergency ordinances must be read at three public meetings. Section 4–9–130, on the other hand, provides that public hearings on notice must be held before final council action is taken to, among other things, make appropriations or levy taxes.

■ Although § 4–9–30(5) provides that a special tax district "shall be created by a council ordinance" upon passage of the referendum, it is nonetheless clear that county government does retain discretion to alter the boundaries of a district proposed by the freeholders, or, alternatively, to refuse to create the district altogether. While the South Carolina Supreme Court has generally held the word "shall" to be mandatory in regard to customary *ministerial* government action conducted pursuant to statute, *see Horry County v. City of Myrtle Beach*, 288 S.C.App. 412, 419, 343 S.E.2d 36, 38–40 (1986), *cert. dismissed*, 293 S.C. 456, 361 S.E.2d 615 (1987) ("shall" and "must" held mandatory for notice and publication requirements inherent with ordinance enactment), *South Carolina Department of Highways and Public Transportation v. Dickinson*, 288 S.C. 189, 341 S.E.2d 134, 135–36 (1986) (term "shall" was mandatory and required hearing to be held within specified twenty (20) day period although time period seemed to be unreasonably short), it has apparently not addressed the question of whether the term "shall" is mandatory where the government action at issue is inherently discretionary or legislative in nature.

Under long-standing principles of law, courts are required to give statutory terms a permissive meaning where the apparent literal meaning would require ignoring the legislative intent and defeating the spirit or purpose of the statute, *see Holy Trinity Church v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), where a permissive interpretation is necessary to uphold the constitutionality of an act, *Des Moines v. Manhatten Oil Co.*, 193 Iowa 1096, 184 N.W. 823 (1921), or where the term's use in relation to other parts of the statute evinces a permissive interpretation. *West Wisconsin R. Co. v. Foley*, 94 U.S. (4 Otto) 100, 103, 24 L.Ed. 71 (1876). As stated in 73 Am.Jur.2d *Statutes* § 25 (emphasis added) (footnotes omitted):

[t]here are cases in which words of a statute, which are generally regarded as mandatory, are nevertheless given a directory or permissive meaning, in order to give effect to the legislative intent. Thus, a legislative intention that the word "shall" is to be construed as permissive may appear from the spirit or purpose of the act, or from the connection in which it is used or the relation into which it is put with other parts of the same statute. It is particularly true that the word "shall" in a statute may be held to be not mandatory, where such a construction is *necessary to uphold the constitutionality of the statute....*

Likewise, the present case gives rise to factors supporting the invocation of each of these exceptions to the general rule of practice that "shall" be construed as mandatory.

First, it is clear, as previously stated, that the Home Rule Act grants enumerated *legislative* powers to county legislative bodies. *See* §§ 4–9–30, 4–9–120 ("council shall take *legislative* action by ordinance") (emphasis added); *North Charleston Land Corp.*, 281 S.C. at 474, 316 S.E.2d at 139.[14] The legislative process is inherently discretionary, and, significantly, the Home Rule Act contains no provision serving to unconditionally abrogate or restrict exercise of the customary level of deliberation and discretion normally associated with the legislative process—at least other than the apparent inadvertent use of the term "shall" in § 4–9–30(5).

In addition to this textual failure to repudiate or limit the exercise of legislative discretion normally exercised by county government under South Carolina law, the Act also contains several provisions which serve to affirmatively reinforce the conclusion that county government retains discretion throughout the special tax district creation process. Specifically, § 4–9–30(5) vests *county council*, and not private citizens, with the sole legislative authority to

---

**14.** As plaintiffs readily concede, the power to create districts which will receive local improvements, and to assess those areas for the cost of the improvements, is a *legislative* function. *Spencer v. Merchant*, 125 U.S. 345, 8 S.Ct. 921, 31 L.Ed. 763 (1888). Also, it is well established that the State legislature may constitutionally delegate this legislative function to county legislative bodies. *See Hancock*, 250 U.S. at 456, 39 S.Ct. at 529–30.

assess taxes, and provides that voter approval is a mere condition precedent to exercise of that authority. Interestingly, the term "shall" is also used within this provision in regard to voting. Section 4–9–30(5)(b), the provision utilized in the present case to satisfy the voter approval condition precedent, provides that "[a] majority of electors voting and a majority of the freeholders voting in the proposed special tax district *shall* approve the creation of that district...." (emphasis added). If the term "shall" was intended to be mandatory in this provision, then voters would apparently have no choice but to approve the proposed district.

Evidently the term "shall," as used in § 4–9–30(5), was intended by the State legislature to signify only that several distinct steps must take place before a special tax district can be created in the discretion of county government. In short, § 4–9–30(5)

gives a two-step process for creation of special tax districts. First, a condition precedent to council consideration is voter approval under one of three alternative procedures, see § 4–9–30(5)(a)–(c). Second, if the district is approved by the voters, county council must still *legislatively* create the district through passage of an ordinance.

As already indicated, § 4–9–120 provides that the passage of an ordinance under the Home Rule Act constitutes legislative action. *See North Charleston Land Corp.*, 281 S.C. at 474, 316 S.E.2d at 139 ("[a]n ordinance is a *legislative* enactment and is presumed to be constitutional") (emphasis added). Thus, county legislative bodies necessarily retain inherent discretionary authority to vary the boundaries of the proposed district, or, to refuse to pass an ordinance creating the district altogether.[15]

---

**15.** Plaintiffs contend that use of the term "shall" in § 4–9–30 serves to deprive Council of the inherent legislative discretion which it, like any duly elected representative body, would ordinarily possess in regard to the question of whether a tax should be imposed on its constituents. Plaintiffs rely on *City of Myrtle Beach v. Richardson*, 280 S.C. 167, 311 S.E.2d 922 (1984) in part to support their argument that Council had no discretion in this process. That case did not address the question of whether county council retained discretion in the special tax district creation process, however, but rather the question of whether the Home Rule Act, specifically § 4–9–30, repealed a prior statute which had vested *all* authority for creation of fire protection districts in county legislative bodies. The court concluded that the prior statute, 1974 Act 1167, which had vested the power to create such districts *exclusively* in county governing bodies, was wholly at odds with § 4–9–30 of the Home Rule Act. As a result, the court determined that § 4–9–30 repealed the prior statute's grant of *exclusive* authority to create such districts, and that § 4–9–30 envisioned a power-sharing arrangement between county legislative bodies and their constituents.

As § 4–9–30 on its face clearly vests county council with legislative authority to pass ordinances to assess and levy ad valorem taxes, the court apparently found it unnecessary to reiterate this point. Rather, because the issue before the court was whether the prior statute's grant of exclusive authority in county governing bodies to create such districts was impliedly repealed by enactment of § 4–9–30, the court sought to concentrate on the critical provision of § 4–9–30 that necessitated implied repeal of

the prior statute: the necessity of voter initiation and approval of special tax districts. In other words, § 4–9–30 envisioned a power-sharing arrangement between county governing bodies and the citizens which they served. Thus, the court proceeded to emphasize the citizens' role in this new arrangement. First, the court noted that the *initiative* to create special tax district now rested with freeholders. 311 S.E.2d at 925. And perhaps more important, the court concluded that "the *power to approve* designated boundaries, specified services and levels of taxation now rests with freeholders and/or electors." *Id.* at 926 (emphasis added).

Of course, the court did not state that county governing bodies did not also have discretion in the special tax district creation process, nor was this issue before the court. Rather, as the court was confronted with the question of whether county governing bodies retained *exclusive* authority to create such districts, the court necessarily focused on the increased participation of freeholders and electors called for by § 4–9–30. Clearly that provision requires voter approval before county council can even consider creation of any special tax district. Thus, the court's conclusions that (1) freeholders must *initiate* the creation of any special tax district; and (2) freeholders and/or electors must *approve* such districts through referendum and election are both supported by the text of § 4–9–30 and do not serve to eliminate county council's discretion in the process.

As to the first conclusion, it is clear that § 4–9–30(5)(a)–(c) (containing the three voter approval condition precedent alternatives to council consideration of an ordinance to create a special tax district) requires the freeholders to *initiate* the district-creation process. Perhaps

Indeed, the requirement that county council pass an ordinance to create a proposed special tax district would be rendered an exercise in futility if, as plaintiffs contend, it was *required* to enact an ordinance to create the *exact* district proposed by the petitioning freeholders and approved in the referendum and/or election. It can be reasonably assumed, however, that the legislature intended local legislative bodies to serve as a check against arbitrary, unsound, or possibly unconstitutional citizen initiatives by virtue of its inclusion of § 4-9-30(5)'s requirement that county council pass an ordinance creating the proposed district notwithstanding voter approval.[16] Consequently, voter approval of a proposed special tax district under § 4-9-30(5) is a mere condition precedent to council's jurisdiction to consider enactment of an authorizing ordinance, and, significantly, was not intended to eliminate council's discretionary role in the process.

Additionally, adoption of plaintiffs' interpretation of the Home Rule Act, rather than vest county government with enhanced legislative power, the stated intent of the Act, would instead render county government hostage to the actions of their own constituents. While an unduly narrow view of § 4-9-30 might colorably support this view, consideration of the Home Rule Act as a whole serves to refute this strained interpretation of that provision. Accordingly, the court concludes that §§ 4-9-120 and 4-9-130 grant affected parties

an adequate opportunity to be heard on the question of benefits as an integral part of the tax district creation process under the Home Rule Act, and that county legislative bodies such as Council retain discretion to refuse to enact an ordinance necessary to create a district approved by the voters or, alternatively, to alter the boundaries of the proposed district.

▇ It is also clear that County Council in fact exercised this grant of discretion in the present case. Although plaintiffs argue that a group of private citizens determined District boundaries and then submitted the material to County Council, the uncontradicted evidence of record shows that Council was involved in the process to create the District almost from its inception. As already indicated, Council initially sponsored studies by the engineering firm of B.P. Barber & Associates, Inc. to determine the water and sewer needs of the county. These studies revealed that the area now comprising the District was in need of a centralized water supply system. Burkhold Affidavit, paras. 3-5. In addition, the record reveals that certain Council members actually served on the Water Study Committee, and regularly reported on its progress to County Council. *See* Council Minutes, December 16, 1985, para. IV, January 20, 1986, para. III, February 3, 1986, para. VI. Indeed, the York county attorney even drafted the proposed ordinance that designated the boundary lines for the District. *Id.*, February 3, 1986,

more important, the court's conclusion that freeholders and/or electors must *approve* any such districts merely confirms, as clear from the plain text of the statute, that the electors and/or freeholders must *approve* the creation of the district through referendum and/or election *or* council cannot even consider passing an ordinance to create such a district. Obviously, the *power* to create such districts now "rests" with the freeholders and/or electors in the sense that their approval in a referendum and/or election is an unconditional, absolute prerequisite to local legislative consideration consideration of an ordinance to create the proposed special tax district. Consequently, plaintiffs' contention that *City of Myrtle Beach* eliminates county council's discretionary role in the district-creation process is without merit.

16. Defendants contend, and this court agrees, that plaintiffs' construction of the statute could

also lead to absurd results. If county council is *required* to enact any petition signed by at least fifteen percent of the freeholders in a proposed district, two landowners controlling, for instance, less than one acre of land combined could submit a petition for council consideration whereby their two tracts be combined in a special tax district with a neighboring tract of 5,000 acres. Because the two landowners could outvote their neighbor in both voting classes, they could force the neighboring landowner to finance unnecessary or extravagant projects if council were required to hold a referendum and election and subsequently approve an ordinance creating *any* proposed district. It is hard to conceive that the State legislative intended such absurd scenarios under this comprehensive statute, and this court will not construe the provision in this manner, especially where to do so would possibly render it unconstitutional.

para. VI. It was the boundaries established by this draft that were eventually adopted and incorporated into the freeholder petition presented to County Council.

In summary, it is clear that Council publicly supported creation of the District and was the initiating and guiding force behind the entire process. Members of Council were intimately involved in the process leading to creation of the District, and Council exercised discretion in passing the resolution calling for the referendum and election, and in adopting the ordinance creating the District. Accordingly, plaintiffs' due process challenge to the comprehensive statutory process used to afford voters a role in determining the level and amount of new taxes to be imposed as well as its challenge to the ordinance creating the Water and Sewer District must be rejected by the court.[17]

■ The court also finds that the procedural due process protections conferred upon plaintiffs by County Council pursuant to §§ 4–9–120 and 4–9–130 were sufficient as a matter of law—even if, as plaintiffs contend, that the principles of *Browning v.*

*Hooper* control disposition of the present case. Of course, the mere fact that the county did not *actually* alter the boundaries of the proposed district does not, standing alone, indicate that County Council had no potential discretionary authority should alterations have become necessary in their judgment. Rather, the focus must necessarily center on whether plaintiffs were afforded an opportunity to state whether they thought their properties would be benefited by inclusion within the proposed district, and whether Council *could* have altered such boundaries in the exercise of their discretion.

At the August 18, 1986, meeting of County Council, representatives of Duke Power Company, one of the plaintiffs in this action, appeared before Council to protest the proposed *referendum and election* scheduled for September 23, 1986. Duke Power representatives presented Council with a constitutional burdens and benefits analysis, asserting that the financing method of the proposed water and sewer district was totally unfair to Duke Power and its customers. Council Minutes, August 28, 1986, para. II. At the October 6, 1986,

---

**17.** In their most recent memorandum filed with this court, plaintiffs dispute the accuracy of statements contained in the Klugh affidavit regarding the chronology of events leading to up adoption of the ordinance at issue. As plaintiffs concede, however, the factual chronology which led to the adoption of the ordinance at issue is not relevant to the construction of § 4–9–30(5), and is also not relevant to the court's disposition of this action. In other words, the court has concluded that § 4–9–30(5), and the comprehensive statutory scheme of which it is a part, *require* county legislative bodies to exercise discretion as to the basis and extent of local ad valorem taxes to be assessed within their respective jurisdictions, and, in addition, that plaintiffs have been given the requisite degree of notice and opportunity to be heard, to the extent required under these circumstances, pursuant to that provision and the comprehensive statutory scheme to which it is a part.

Plaintiffs also contend that mere participation by Council members in the activities of the Water Study Committee does not transform that committee's actions into formal council action. This court agrees. As plaintiffs readily concede, the actions of individual members of County Council or of the Water Study Committee are not relevant to the construction of § 4–9–30, and the court has included this background

information only to reveal that the discretion accorded Council by § 4–9–30 of the Home Rule Act was in fact exercised in this case. It is well settled that the construction of a statute is a matter of law for the court. *Bingham's Trust v. Commissioner of Internal Revenue,* 325 U.S. 365, 370, 65 S.Ct. 1232, 1235, 89 L.Ed. 1670 (1945). Consequently, the constitutionality of a statute challenged on due process grounds does not depend on the events which actually occurred, but is determined by the procedures prescribed in the statute itself. *Coe v. Armour Fertilizer Works,* 237 U.S. 413, 35 S.Ct. 625, 59 L.Ed. 1027 (1915).

Where plaintiffs' argument misses the mark, however, is in erroneously confining their analysis to § 4–9–30(5), without also considering the procedural provisions contained in the same Article which operate in conjunction with that provision. Because § 4–9–30, like the other substantive provisions contained in the Home Rule Act, do not each contain procedural due process protections, these substantive provisions were intended to work in conjunction with the general procedural provisions contained in the statute, and which are implicated when local government, among other things, attempts to levy taxes through passage of an ordinance. *See* §§ 4–9–120, 4–9–130. Accordingly, plaintiffs' latest contentions do not affect the court's disposition of this matter.

Council meeting, the subject ordinance was unanimously given its first reading in accordance with § 4–9–120. *Id.*, October 6, 1986, para. XIII. The minutes of the October 20, 1986, meeting of County Council indicate that Council voted unanimously to give the second reading to the ordinance, as required by § 4–9–120, and also agreed to hold a noticed public hearing, as required by § 4–9–130, on November 10, 1986. *Id.*, October 20, 1986, para. X. Significantly, at the November 10, 1986, hearing, representatives of the plaintiffs appeared and opposed the creation of the District. The plaintiffs were therefore afforded the opportunity to oppose the creation of the District and the Council was apparently unmoved by their presentation.

Plaintiffs contend that *Browning v. Hooper, supra,* controls the instant action. Upon the petition of 50 resident voters of any county under the statutory scheme at issue in *Browning v. Hooper,* the Court stated that it was the "duty" of the commissioners' court to order an election in the district as described in the petition. Moreover, if two-thirds of the votes cast were in favor of the proposition, the commissioners' court, a nonlegislative body, was "required" to issue and sell the bonds for the exact district proposed by the voters. *Id.* 269 U.S. at 401, 46 S.Ct. at 142. The Court noted that the legislature did not *levy* the tax, and that the duties of the commissioners' court were purely *ministerial.* Perhaps most important, the appellants in *Browning v. Hooper* were not afforded *any* opportunity to be heard on the question of whether their properties would be benefited by inclusion within the proposed special tax district.

Unlike in *Browning v. Hooper,* where affected landowners were deprived of *any* opportunity to be heard, the plaintiffs here, along with any other interested parties, were afforded three public meetings and a public hearing, all of which were required by statute, to state their opposition to the proposed ordinance. See §§ 4–9–120, 4–9–130. Significantly, this hearing was held *prior* to council's legislative enactment of the ordinance which created the District, as required by the procedural protections contained in §§ 4–9–120 and 4–9–130. In addition, whereas the *Browning v. Hooper* Court noted that the duties of the commissioners' court were purely ministerial, specifically, that the commissioners' court was "required" to issue and sell the proposed bonds, *legislative* approval of an ordinance to finance the present District was necessary under § 4–9–30(5).

Indeed, the District approved by the electors and freeholders was of no force and effect *unless and until* County Council enacted an ordinance to (1) create the district; and (2) levy taxes necessary to finance the local improvements authorized. As a result, the due process objections that rendered the statutory process in *Browning v. Hooper* invalid are not implicated here. First, under the Home Rule Act, local legislative bodies, and not private citizens, are vested with the authority to *levy* taxes sufficient to finance local improvements. *See* § 4–9–30. The statute provides that "council shall take *legislative* action by ordinance," § 4–9–120, and the State Supreme Court has determined that an ordinance enacted by county council is the equivalent of a statute under State law. *North Charleston Land Corporation,* 281 S.C. at 474, 316 S.E.2d at 139. Thus, a legislative body must approve creation of the district proposed by the voters, and must also approve any taxes required to fund necessary improvements. Section 4–9–30's requirement that County Council *legislatively* approve the proposed district, as well as any taxes required to fund local improvements authorized thereby, is wholly distinguishable from the ministerial role of the commissioners' court, which of course, unlike County Council presently, did not ordinarily exercise legislative discretion, and, perhaps more importantly, was not expressly vested with such discretion under the statutory process at issue there.

In contrast, County Council, as a legislative body, ordinarily exercised legislative discretion, and necessarily retained authority by virtue of the provisions of the Home Rule Act which grant increased powers to county government. As a result, Council

retained authority to alter the boundaries proposed by the voters, or, alternatively, in the exercise of its legislative discretion, could refuse to enact the ordinance altogether—for any reason or no reason at all. "[I]t is essential to due process of law that [affected landowners] be given notice and opportunity to be heard," *Browning v. Hooper,* 269 U.S. at 405, 46 S.Ct. at 143, and it is clear that plaintiffs were in fact afforded such an opportunity. Accordingly, the plaintiffs have been afforded their rights under the due process clause of the fourteenth Amendment, and the procedures utilized to create the District pursuant to § 4–9–30(5)(b) do not offend due process of law.

### III. Standing to Assert "One Man, One Vote" Claim:

█ Plaintiffs contend that the dual ballot box procedure required by § 4–9–30(5)(b) and used by York officials to conduct the September 23, 1986, referendum and election violates the "one man, one vote" principle announced in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and thus violates the equal protection clause. In support of this assertion, plaintiffs contend that the property owners, through the exercise of their franchise, *could* potentially frustrate the will of the electors by failing to approve a proposed tax district by a majority vote. Plaintiffs submit that this procedure facially and, as applied, violates the equal protection clause. Plaintiffs also argue that they possess standing to attack this procedure because, if the assessment under the ordinance is levied, they will suffer injury from increased taxation and, in addition, because they assert their injury is judicially remediable. Defendants contend, however, that plaintiffs, as freeholders, lack standing to assert any constitutional injury allegedly suffered by the class of electors. In other words, defendants contend that plaintiffs do not have standing to assert the rights of a third party.

The court finds that the plaintiffs lack standing to assert the rights of an effectively adverse entity, the electors. The justiciability aspect of standing requires that plaintiffs (1) have a personal stake in the outcome of the controversy (injury in fact), and (2) that their injury be judicially remediable. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Duke Power Company v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 72–73, 98 S.Ct. 2620, 2630–31, 57 L.Ed.2d 595 (1978). Obviously, plaintiffs satisfy this initial aspect of the standing inquiry. First, if ad valorem taxes are levied pursuant to the subject ordinance, the plaintiffs will inevitably be required to pay a substantial share of this burden. Thus, plaintiffs have demonstrated that they have a sufficient personal stake in the outcome of this dispute. Second, if the procedures used to create the district were deemed unconstitutional, this court's remedial powers could be invoked to redress any injury.

The justiciability aspect of the standing doctrine, however, does not end the inquiry where a party attempts to assert the rights of a third party. "Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). Although a party may suffer direct and substantial injury from the application of the challenged statute, the *Barrows* Court declared that he or she nevertheless cannot challenge its constitutionality *unless* the party shows it is within the class of persons whose constitutional rights were allegedly infringed. *Id.* at 256, 73 S.Ct. at 1035. In support of this assertion, the Court noted that when actually faced with the question, the state court might narrowly construe the statute to obliterate the objectionable feature, or might declare the unconstitutional provisions separable. *Id.* The Court also noted that it would be undesirable for federal courts to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation. Accordingly, the court stated that the "salutory rule" precluding a party from asserting *jus tertii* should only be disregarded where "out-

weighed by the need to protect the fundamental rights" of the third party. *Id.*

In *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960), the Court determined it had no jurisdiction to pronounce any State statute void "because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." *Id.* at 21, 80 S.Ct. at 522. As a corollary to this rule, the Court concluded that third party standing did not exist *unless* the facts of the case gave rise to an unconstitutional application. As stated by the Court:

> [k]indred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.

*Id.* In support of this principle, the Court noted that judicial review should be exercised sparingly, citing *Marbury v. Madison*, 1 Cranch 137, 177–80, 2 L.Ed. 60 (1803). Thus, as already stated, the Court deemed it undesirable "to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." 362 U.S. at 21, 80 S.Ct. at 523. The Court concluded that statutes should not be pronounced unconstitutional "with reference to hypothetical cases thus imagined." *Id.* Nevertheless, the Court listed certain exceptions to this "rule of practice," but noted that these exceptions were only implicated where weighty countervailing policies had been

recognized. *Id.* The Court has more recently reaffirmed this principle in several contexts. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988); *Hodel v. Virginia Surface Mining Reclamation Association*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

In light of these precedents, it is clear that the plaintiff power companies, as freeholders, do not have standing to assert the rights of the electors *unless* weighty policy considerations outweigh the well-established rule of practice against assertions of *jus tertii*. Application of these principles to the present case reveals that no such weighty considerations exist. Initially, it must be noted that no injury was suffered by the electors in the present case.[18] In the line of cases beginning with *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and including *Kramer v. Union Free School District Number Fifteen*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), *Hill v. Stone*, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975), and *Hayward v. Clay*, 573 F.2d 187 (4th Cir.), *cert. denied*, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 351 (1978), the freeholders, as a separate voting block, had *actually* diluted the voting power of the electors by effectively vetoing and frustrating the will of the majority of the citizens in their respective tax districts. In the present case, however, the majority of the electors, the allegedly injured party, approved creation

---

**18.** It would appear quite improvident for a federal court to strike down a comprehensive state statutory process where no constitutional injury has been suffered by the party entitled to enforcement of the allegedly infringed constitutional right. *Warth v. Seldin*, 422 U.S. at 498, 95 S.Ct. at 2205 (prudential limitations on exercise of federal jurisdiction "founded in concern about the proper—and properly limited—role of the courts in a democratic society"). Invocation of these prudential principles is even more appropriate in the context of third party standing where state legislation is at issue due to well-established principles of comity toward state courts and principles of federalism. *See Shamrock Oil & Gas Corporation v. Sheets*, 313 U.S.

100, 108–109, 61 S.Ct. 868, 872, 85 L.Ed. 1214 (1941) (principles of federalism require due regard for rightful independence of state governments); *Murray v. Carrier*, 477 U.S. 478, 487, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (federal courts should avoid needless frustration of states' good faith attempts to honor federal constitutional rights).

Of course, had the class of electors in fact suffered a constitutional injury (*i.e.,* the class of electors approved creation of the district whereas the class of freeholders did not), they would themselves have standing to assert a "one man, one vote" equal protection claim under the line of cases beginning with *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

**1332**

of the District by an overwhelming majority. In addition, a majority of the freeholders approved creation of the District, again by an overwhelming margin. Presumably the plaintiffs exercised their right to vote as freeholders. Now the plaintiffs seek to assert that allowing the freeholders to vote was unconstitutional.

As an initial matter, as previously stated, it is clear that no injury was suffered by the electors in the present case. The electors voted to approve the process, and now the plaintiffs seek to frustrate the will of the majority by asserting the rights of an uninjured party, the electors. As is quite apparent, the interests of the class of electors and the plaintiffs presently are not at all harmonious, but rather are essentially adverse. To allow the plaintiffs to assert the rights of an uninjured third party with basically adverse interests would hardly present an ideal case or controversy for adjudication by this court.

Perhaps most important, plaintiffs have failed to show that any exception to the rule against assertions of *jus tertii* exists on the present facts. First, no claim of first amendment overbreadth is alleged by the plaintiffs. *See Massachusetts v. Oaks*, —— U.S. ——, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989). Second, there is no allegation that if the electors themselves had been injured, they could not effectively assert their rights under the statute. *See Barrows, supra.* Third, plaintiffs have

presented this court with no overriding policy interest which would justify ignoring the well-established rule of practice against assertions of *jus tertii* repeatedly emphasized by the Supreme Court. Accordingly, this court finds that plaintiffs lack standing to assert the rights of an uninjured third party with adverse interests.[19]

### IV. Confiscatory Taking:

■ Primarily relying upon the burdens and benefits analysis enunciated in *Myles Salt Company v. Board of Commissioners*, 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916) and *Thomas v. Kansas City Southern Railway Company*, 261 U.S. 481, 43 S.Ct. 440, 67 L.Ed. 758 (1923), plaintiffs contend that the ad valorem tax imposed by the subject ordinance violates the fifth and fourteenth amendments because it results in such a flagrant and palpable inequality between the burden imposed and the benefit received as to effectively amount to the confiscatory taking of their property without just compensation. More particularly, although acknowledging that there is generally no requirement that the benefit conferred be equal to the burden imposed, plaintiffs nevertheless assert that the critical question is whether the burden imposed so far outweighs the benefit received as to amount to an unconstitutional burden upon their property.

---

**19.** Immediately before the hearing on this matter, plaintiffs submitted additional authorities which they contended were more analogous than prior authorities submitted on the question of plaintiffs' standing to contest the referendum and election procedures contained in § 4–9–30(5)(b). The court is somewhat puzzled, however, by this assessment. The facts of the present case are readily distinguishable from each of the submitted cases: *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *EEOC v. City of Memphis*, 581 F.Supp. 179 (W.D. Tenn.1983); and *In re Dept. of Energy Stripper Well Exemption Litigation*, 578 F.Supp. 586, 599–600 (D.Kan.1984), *modified on other grounds*, 744 F.2d 98 (T.E.C.A.1984), *cert. denied*, 469 U.S. 1077, 105 S.Ct. 576, 83 L.Ed.2d 515 (1984).

Whereas the *Chadha* Court rejected the contention that plaintiff lacked standing because a consequence of him prevailing would advance the interests of third parties, the facts in the

present case reveal that a decision in favor of plaintiffs would *harm* the interests of the allegedly injured party, the electors, the interests of which plaintiffs desire to represent in this litigation. *EEOC v. City of Memphis* is also wholly inapposite to the standing question before this court because the issue of third party standing was not even addressed by that court. Rather, the issue there was whether defendant had actually suffered a sufficiently concrete injury to confer standing. Finally, the critical factors in the instant case that render a decision on the merits prudentially unwise—(1) that the interests of the electors and the power companies are not harmonious, and (2) that plaintiffs here are attempting to assert the rights of a third party—were not present in *In re Dept. of Energy Stripper Well Exemption*. Accordingly, these additional authorities do not confer plaintiffs with standing to attack § 4–9–30(5)(b) on equal protection grounds.

Although plaintiffs concede that indirect benefits may sometimes justify a special assessment, they also argue that vague speculation of indirect benefits will not justify an assessment which imposes a burden manifestly unequal to that imposed on other property owners. Asserting that special benefits are those conferred upon the property in addition to those received by the community-at-large, plaintiffs allege that they will bear approximately seventy-one percent of the cost of the Western York County Water and Sewer System, yet will not receive any direct benefit because they have installed, and maintain at their own expense, private water and sewer facilities for Catawba. Plaintiffs also allege that County Council did not rely on, and defendants have failed to present, any evidence which shows that the construction of the proposed facilities will confer any of the benefits to plaintiffs' property asserted by Council. Consequently, plaintiffs maintain that any benefits derived from construction of these facilities will accrue to York as a whole, and apparently not only to property located within the District.

In addition to the alleged severe burden imposed, plaintiffs also contend that Council's actions in creating the District were wholly arbitrary and capricious. First, plaintiffs allege that County Council did not conduct any benefits and burdens analysis. Second, plaintiffs assert that Council members consistently relied upon benefits which will inure to the entire county—yet failed to identify any special benefit that will accrue to plaintiffs' property. Finally, plaintiffs contend that at least one Council member implicitly acknowledged that a key consideration in the chosen method of financing the District was the allegedly great burden which would ultimately be borne by Catawba. Plaintiffs thus urge this court to find that Council's actions in creating the District were arbitrary and capricious and designed to take advantage of the enormous taxes which could be generated by Catawba.

In support of this contention, plaintiffs submit that the tax sought to be imposed is a special assessment. Plaintiffs argue that a great distinction exists between general taxes and special assessments; namely, unlike a general tax, a special assessment must return some benefit to the assessed property in order to pass constitutional muster. Additionally, plaintiffs assert that public policy also justifies the distinction between general taxes and special assessments. Specifically, plaintiffs reason that if the taxing jurisdiction has the ability to levy a disproportionately high tax on some property above and beyond the encumbrance levied on other property, that fairness requires the return of some corresponding benefit.

In the present case plaintiffs allege that four facts compel the conclusion that the creation of the District was an arbitrary exercise of legislative power in violation of the fourteenth amendment: (1) Catawba is the single most valuable piece of property in the District; (2) selection of the ad valorem method of taxation as the sole basis to finance the proposed Water and Sewer District; (3) neither County Council nor the Water Study Committee allegedly made any comparison of the benefits and the burdens, despite knowledge that Catawba would bear the lion's share of the tax burden; and (4) the only possible benefit to Catawba from the District is indirect, speculative, and general, as compared to the direct, immediate and certain benefits which will accrue to other property owners in the District. Plaintiffs seek to illustrate this alleged gross disparity by a comparison of the burden to be borne by an average homeowner whose property is valued at $50,000.00 and that of the plaintiffs' property. The average homeowner would incur an annual tax of $14.00, whereas Catawba would bear an annual tax of approximately $1,628,655.00.[20] Although

---

**20.** According to Council, "[i]f a maximum 7 mill [ad valorem] tax is levied against the interest of Duke Power Company in the Catawba Nuclear Station the average Duke consumer would pay approximately 1–½ cents per month in addition-al electric rates ($262,500.00 in annual taxes divided by Duke's 1,400,000 consumers equals approximately 18 cents per year)." Klugh affidavit, Exhibit C, statement of York County Council, September 2, 1986, p. 3.

plaintiffs argue that federal courts should ordinarily defer to state legislative enactments and presume that land included within a special tax district will receive a benefit that justifies the burden imposed, they nonetheless contend that the legislature's discretion to create a special tax district is not unlimited and that this presumption does not control in the face of plainly arbitrary action. Plaintiffs thus urge this court to strike down this particular assessment on grounds that it violates the fifth and fourteenth amendments.

Asserting plaintiffs shoulder the burden of proving that the tax assessment at issue violates the Constitution, defendants submit that the objectively applied, uniform ad valorem tax imposed by the subject ordinance violates the fifth and fourteenth amendments only if the legislative determination which led to its assessment was palpably discriminatory or a plain abuse of governmental taxing power. While defendants concede that plaintiffs' property is extremely valuable, and thus would bear a large portion of the cost, defendants nevertheless assert that this factor alone is not sufficient to necessitate the exclusion of plaintiffs' property from assessments necessary to finance a public improvement designed to improve the general health and welfare of the surrounding community.

In applying this standard to water and sewer improvement districts, defendants assert that courts look not only to the benefit of actual water or sewer service to the property taxed, but also recognize the shared benefits that accrue to all property within the area from improved public health and safety, increased economic development, increased property values, and an increased tax base. Additionally, defendants contend courts uniformly recognize that determinations concerning the existence and value of these *shared benefits* are primarily legislative in nature. Defendants allege that acceptance of plaintiffs' argument—namely, that their due process rights are violated merely because their property is very valuable compared to the remaining property in the District—would have far-reaching implications which would virtually exempt industrial property from ad valorem taxation whenever conveniently located in an undeveloped area.

Defendants further submit that § 4-9-30(5) primarily requires the imposition of ad valorem assessments, and that the use of ad valorem assessments to finance the district does not violate constitutional guarantees of due process or protection against confiscatory takings. Noting that no method of apportioning tax burdens, no matter how evenhandedly applied, is totally fair, defendants nonetheless argue that the proper allocation of tax burdens is a political question entrusted to the states and their political subdivisions. Defendants also argue that the tax burden is not unconstitutional because plaintiffs have failed to show that the inclusion of their property within the District was arbitrary or a flagrant abuse of discretion—as their property is logically and reasonably included within the District, and, in addition, that District boundaries would have to be gerrymandered in order to exclude plaintiffs' property.

Turning to the question of benefits, defendants argue that the existence and value of benefits is primarily a legislative determination, and that plaintiffs will receive shared benefits, along with the remaining property located within the District, from the improved public health and safety, increased economic development, increased property values, and increased tax base flowing from the water and sewer improvements. More particularly, plaintiffs contend that the growth and development of Western York County, the area surrounding plaintiffs' property, was largely a result of plaintiffs' decision to build Catawba in Western York. Thus, defendants submit that the benefits of improved water and sewer facilities will inure to the benefit of the entire Western York community—including plaintiffs' property.

Defendants also assert that merely because plaintiffs' property already receives private water and sewer service does not render its inclusion in the improvements district unconstitutional—as defendants contend it is well settled that property does not have to need public services in order to

be subjected to taxes necessary to finance similar public facilities. Emphasizing the numerous tax breaks which large industrial facilities like Catawba already enjoy under South Carolina law, including a five year exemption from general property taxes, *see* S.C.Code Ann. § 12–37–220(A)(7), defendants contend that exclusion of Catawba from the District would be particularly unfair. Significantly, defendants submit that the size of the burden imposed on the plaintiffs' property is a direct consequence of the fact that they have chosen to place an expensive nuclear power station in a largely undeveloped area. Finally, defendants contend that plaintiffs' situation is no different from that of individual District residents who, although equally subject to ad valorem assessments under the ordinance, have expended their own money to drill private wells or to be connected to private water and sewer systems and thus have no need for the water and sewer facilities.

Proper evaluation of a takings clause issue must begin with reference to certain well-established principles which limit the power of states and their subdivisions to levy taxes necessary to finance local improvements. Of course, plaintiffs do not dispute that each sovereign State may constitutionally establish local districts to include real property that it finds will be specially benefited by local improvements therein, nor that such entities may impose special tax burdens upon the benefited lands to acquire, construct, maintain, and operate such facilities. *Chesebro v. Los Angeles Flood Control District,* 306 U.S. 459, 463–64, 59 S.Ct. 622, 624, 83 L.Ed. 921 (1939). As a corollary to this foundation principle of our federal system, it is also well recognized that state legislatures may levy taxes, or may delegate such authority to local governments, and that "their action[s] cannot be assailed under the 14th Amendment unless it is palpably arbitrary and a plain abuse" of governmental taxing power. *Kansas City Southern Railway Company v. Road Improvement District,* 256 U.S. 658, 660, 41 S.Ct. 604, 605, 65 L.Ed. 1151 (1921); *Houck v. Little River Drainage District,* 239 U.S. 254, 263, 36 S.Ct. 58, 60, 60 L.Ed. 266 (1915).

Significantly, as plaintiffs maintain, a distinction has sometimes been drawn between general taxes and special assessments. Notably, the exaction of general taxes for public improvements never implicates the takings clause of the fifth amendment as incorporated through the fourteenth amendment. *County of Mobile v. Kimball,* 102 U.S. (12 Otto) 695, 703, 26 L.Ed. 238 (1880).[21] Where the legislature or one of its subdivisions imposes a special assessment upon property owners in order to finance improvements which will specially benefit certain private property, however, the fifth and fourteenth amendments require that there be some reasonable relationship between the burden imposed on each assessed property and the benefit, whether direct or indirect, which will be received by that property. *Atchison,* 346

---

**21.** The court is of the opinion that the proposed improvements are arguably more properly classified as public improvements rather than special improvements designed to benefit specific parcels of realty. According to Council's statement explaining the benefits to be derived from the District for all of the property located within Western York, the "water district will provide an *adequate and dependable source of water* for present and future residents of the district," and will "provide better *fire protection* for residents of the district." Klugh Affidavit, Exhibit C, Statement of York County Council, September 2, 1986, p. 1. These statements indicate that the proposed improvements are essential to preservation of the general health and welfare of District residents. As such, these are not improvements whose purpose is to enhance the value of the property involved but rather were instituted by York County Council to meet local health and safety needs made necessary by the rapid growth of Western York County. *See Atchison, Topeka & Santa Fe Railway Co. v. Public Utilities Commission,* 346 U.S. 346, 352, 74 S.Ct. 92, 96, 98 L.Ed. 51 (1953). Accordingly, as in *Atchison,* the plaintiffs are not entitled to have the costs of the improvements allocated only on the basis of the benefits which will accrue to their property, but rather are only entitled to a "fair and reasonable" overall tax burden. *Id.* Under the *Atchison* principle, therefore, plaintiffs' argument that several of the benefits flowing from the improvements would confer no special benefit upon their property, but rather would benefit the county as a whole, are not relevant. In the alternative, the court will address the issue of benefits in the event that the proposed water and sewer facilities are more in the nature of a special improvement.

U.S. at 352, 74 S.Ct. at 96; *Dane v. Jackson*, 256 U.S. 589, 41 S.Ct. 566, 65 L.Ed. 1107 (1921); *Houck*, 239 U.S. at 266, 36 S.Ct. at 61. The legislative determination that lands will be benefited by a public improvement for which it authorizes a special tax is ordinarily conclusive and binding upon the courts. *Thomas v. Kansas City Southern Railway Company*, 261 U.S. 481, 43 S.Ct. 440, 441, 67 L.Ed. 758 (1923).

Courts have sometimes drawn a distinction between taxes imposed by the legislature itself and those imposed by an inferior *administrative* or *quasi-judicial* authority. Nevertheless, where the legislature itself, or a local governmental body authorized to legislatively assess taxes under applicable state law, has determined that lands within the local improvement district will be specially benefited by the improvements, this legislative determination is conclusive and is binding upon the courts. *Hancock v. City of Muskogee*, 250 U.S. at 459, 39 S.Ct. at 530; *Chesebro*, 306 U.S. at 464, 59 S.Ct. at 624. Where the district was not created in this fashion, however, and there has been no *legislative* determination that property located within the improvement district will be benefited, the owners of property located within the district are entitled "to be heard by some officer or tribunal empowered by the State to hear them and to consider and decide whether their lands will be specially benefited." *Id.* at 464, 59 S.Ct. at 625. It is from this latter proposition that plaintiffs seek to invalidate the tax burden imposed to finance the Water and Sewer District.

Due to the nature of the requirement that affected landowners receive some benefit in exchange for the burden imposed, courts have developed guidelines to determine whether the purported benefits are sufficient to justify the burden imposed. The benefit need not be direct, however, but rather may be indirect and intangible. *Morton Salt Company v. City of South Hutchinson*, 177 F.2d 889 (10th Cir.1949). Nevertheless, justifications consisting solely of vague speculation or prophecy of future benefits will not save a grossly discriminatory tax—at least where the improvements do not confer important shared benefits upon the community-at-large. *Thomas*, 261 U.S. at 485, 43 S.Ct. at 441. Finally, it is appropriate for this court to take judicial notice of benefits which will inevitably flow to all property within a local improvement district, *Morton Salt Company v. City of South Hutchinson*, 159 F.2d 897, 902 (10th Cir.1947), especially where, as here, both parties have agreed on all material facts.

In *Myles Salt Company* and *Thomas*, the two primary cases upon which plaintiffs rely, the Supreme Court struck down tax assessments which it determined were "palpably arbitrary" and a "plain abuse of governmental taxing power." In *Thomas* a special drainage improvement district was created to be financed fifty-seven percent by the plaintiff and forty-three percent by all other property owners within the district. Concluding the defendants had sought to justify the assessment on the basis of vague speculation that the railroad would receive future increased business by virtue of the improvement, and that the tax burden imposed on the railroad was severely heavy in contrast to the very small burden imposed on lands that would receive a large direct benefit, the Court concluded that the special assessment imposed upon the plaintiff was grossly discriminatory in violation of the fourteenth amendment. *Id.*

Likewise, the *Myles* Court struck down an assessment burden levied upon the owner of elevated property to finance a drainage district from which the property could not be benefited directly *or indirectly*. *Id.* 239 U.S. at 484, 36 S.Ct. at 205. Thus, the Court reasoned that plaintiffs' property had been included within the improvement district solely for the purpose of financing improvements to benefit other property. *Id.*

*Myles* and *Thomas* make clear that property subjected to a special assessment must derive some benefit, whether direct or indirect, tangible or intangible, in return for the tax burden borne by that property. In other words, a special assessment is constitutionally impermissible only where the land at issue will either (1) receive *no* benefit by virtue of the proposed improvement,

*Myles, supra,* or (2) where the sole justification for the levy consists of vague prophesies or predictions of future benefit to the property, *Thomas, supra.* Although *Myles* and *Thomas* remain binding precedent upon this court, it nonetheless cannot be overlooked that the continuing validity of these precedents has been called into question, *Furey,* 780 F.2d at 1454 n. 5, and, perhaps even more telling, have rarely been invoked in federal court in over 70 years. *Id.* In light of the fact that County Council qualifies as a legislative body under the *Hancock* Court's definition, the extremely narrow circumstances under which special assessments have ever been struck down pursuant to the benefits/burdens analysis, and by virtue of the numerous *indirect* benefits which will undoubtedly flow to Catawba and its owners, the court has concluded that the tax burden imposed pursuant to the subject ordinance does not violate the fifth and fourteenth amendments.

Although Catawba utilizes private water and sewer facilities, and thus will arguably not reap direct benefits from installation of the proposed water and sewer facilities, the indirect and intangible benefits that will undoubtedly flow to plaintiffs' property are numerous. And, of course, this court must view plaintiffs' property apart from the particular use to which it is *currently* subjected by its owners. *City of Orangeburg v. Southern Railway Company,* 55 F.Supp. 171, 179 (E.D.S.C.1944). Additionally, the mere fact that plaintiffs have expended money to install private facilities does not, standing alone, accord them an exemption from special assessments necessary to finance similar public facilities. *Morton Salt Company v. City of South Hutchinson,* 177 F.2d 889 (10th Cir.1949). *See Ex Parte Yeargin,* 295 S.C. 521, 369 S.E.2d 844 (1988).

Although, as already stated, plaintiffs' property will arguably receive no *direct* benefit from the water and sewer improvements at issue, at least in its current use, "[c]ertainly the tax is no less constitutional because the benefit conferred is indirect and intangible." *Morton Salt Company,* 159 F.2d at 902. In evaluating whether sufficient indirect and intangible benefits are conferred upon plaintiffs' property by virtue of the proposed improvements, this court must elevate and consider the substance of Council's justification over the mere form in which presented. *Chesebro,* 306 U.S. at 464–66, 59 S.Ct. at 625.

Certain background information is helpful to properly evaluate the benefits question. In 1986 Western York was the subject of a water system planning study by the engineering and planning firm of B.P. Barber & Associates, Inc. The resulting report was entitled "Water System Feasibility Study for the Clover–York–Lake Wylie Portion of Western York County" (B.P. Barber study). It concluded that "Western York County ... is facing an extremely rapid period of growth ... [T]his rapid growth will create problems in the area of potable water supply." B.P. Barber study, p. I–1; Burkhold Affidavit, paras. 3–6.

Catawba is located on the neck of a peninsula of land on the western shore of Lake Wylie well within the boundaries of the District. Residences to be served by the system are located all around Catawba. As property owners located in the District, plaintiffs will receive the benefits of a water and sewer system which, like many of the District's individual property owners, is not apparently necessary for the current uses to which their property is utilized. Nevertheless, the benefits of the District, including increased public health and safety, "redound[ ] to the benefit of the whole community of which [they are] a part." *Morton Salt Company,* 159 F.2d at 902. More particularly, Council members identified several benefits, most notably improved public health and safety, which obviously benefits numerous employees of Catawba who live in the District, of which this court is constrained to take judicial notice. Indeed, as noted by defendants, the presence of Catawba is responsible in part for the development of Western York, a development which has also presumably increased the need for an integrated water and sewer system—as Catawba personnel have migrated to York and increased the

demand on existing water and sewer facilities. Accordingly, it is clear that plaintiffs' property will receive *every* benefit the District will confer upon other lands within its boundaries except the direct benefits which flow from receipt of public water and sewer service.

In addition to the indirect and intangible benefits that will flow to plaintiffs' property and business interests by virtue of the proposed water and sewer improvements, it is also clear that the maximum seven mills ad valorem burden imposed under the ordinance is no greater than that imposed on adjacent landowners. In other words, the ad valorem assessment at issue is evenhandedly applied, and the same millage rate is applied to all property within the District. Plaintiffs apparently argue that because their property is worth much more than adjacent undeveloped or less developed properties, that somehow their property should be excepted from a uniformly applied millage rate. This argument, however, was rejected by the Supreme Court in *Branson v. Bush*, 251 U.S. 182, 40 S.Ct. 113, 64 L.Ed. 215 (1919). In *Branson*, the Court stated that the value of the respective property was the proper basis for taxation. 251 U.S. at 187, 40 S.Ct. at 114–15. Consequently, the mere fact that inequality has resulted from the application of a common method of taxation—an ad valorem assessment—is an "incidental inequality resulting from a valid classification . . . which does not fall within the scope of the fourteenth amendment. . . ." 251 U.S. at 188, 40 S.Ct. at 115.

This principle was also recognized in *Fallbrook Irrigation District v. Bradley*, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896), where the Court stated:

> where the fact of *some* benefit accruing to all the lands has been *legally* found, can it be that the adoption of an *ad valorem* method of assessing the lands is to be held a violation of the Federal Constitution? It seems to us clearly not. It is one of those matters of detail in arriving at the proper and fair amount and proportion of the tax that is to be levied on the land with regard to the benefits it has received, which is open to

the discretion of the state legislature, and with which this court ought to have nothing to do. The way of arriving at the amount may be in some instances inequitable and unequal, but that is far from rising to the level of a constitutional problem and far from a case of taking property without due process of law.

164 U.S. at 177, 17 S.Ct. at 70 (emphasis added). Similarly, although an ad valorem method of assessment as provided by § 4–9–30(5) may result in a somewhat greater burden imposed upon plaintiffs' property, at least if the great disparity between the value of plaintiffs' property and surrounding tracts is ignored, it nonetheless is clear that the burden imposed upon plaintiffs' property by this special assessment is not palpably arbitrary or an abuse of governmental taxing power, but merely rather naturally results from the evenhanded, uniform ad valorem assessment applied against all real property located within the District. *Branson*, 251 U.S. at 183, 188, 40 S.Ct. at 113, 115. *See Fallbrook Irrigation District*, 164 U.S. at 176–77, 17 S.Ct. at 69–70; *Dane*, 256 U.S. at 599, 41 S.Ct. at 568; *Kansas City Southern Railway Company*, 256 U.S. at 661, 41 S.Ct. at 605 (plaintiffs' property "may not be burdened for local improvements upon a basis so wholly different from that used for ascertaining the contribution demanded of individual owners as necessarily to produce manifest inequality.").

Plaintiffs apparently concede that they should shoulder their share of taxes essential to maintaining an organized society, *Morton Salt Company*, 159 F.2d at 901, but nevertheless contend that this special assessment is constitutionally infirm. The sincerity of this contention is dubious, however, in light of the numerous tax advantages already enjoyed by the owners of Catawba, including a five year exemption from general property taxes. § 12–37–220(A)(7). *See* §§ 4–29–67, 12–37–220, 12–37–225; South Carolina Constitution, Article X, Section 3(g). Even apart from this consideration, however, the court is constrained to conclude that the assessment burden at

issue is reasonable and is not palpably arbitrary or a plain abuse of governmental taxing power. As it is not within the judicial province to correct every alleged abuse of legislative taxing power, *Providence Bank v. Billings*, 29 U.S. (4 Pet.) 514, 561, 7 L.Ed. 939 (1830) (Marshall, C.J.); *Dane*, 256 U.S. at 601, 41 S.Ct. at 569, plaintiffs' contention that the ad valorem assessment levied under the subject ordinance violates the fifth and fourteenth amendments must be rejected.

Based on the foregoing reasoning and cited authorities, this court is constrained to grant defendants' motion for summary judgment. Plaintiffs' motion for summary judgment is denied. Rule 56, Fed.R.Civ. Proc.

IT IS SO ORDERED.